234

Action Alliance of Senior Citizens of Greater Philadelphia, Inc., by Michael Tyson and D. William Zuckerman, Trustees ad Litem et al., Appellants *v.* Philadelphia Gas Commission et al., Appellees.

Argued April 4, 1979, before President Judge Bow-
MAN and Judges CRUMLISH, JR., WILKINSON, JR.,
ROGERS, BLATT, CRAIG and MACPHAIL. Judges MENCER
and DISALLE did not participate.

*Philip P. Kalodner*, with him *Andre C. Dasent*, and
*Jonathan M. Stein*, for appellants.

*Pace Reich*, Assistant City Solicitor, and *Joseph
Davison*, with them *Barton A. Hertzbach*, and *Ober-
mayer, Rebmann, Maxwell & Hippel*, for appellees.

OPINION BY JUDGE ROGERS, August 24, 1979:
Action Alliance of Senior Citizens of Greater Phil-
adelphia, Inc. and the Consumer Education and Pro-

tective Association have appealed from an order of the Court of Common Pleas of Philadelphia County affirming a decision of the Philadelphia Gas Commission approving a rate increase submitted on behalf of the Philadelphia Gas Works by its operator, the Philadelphia Facilities Management Corporation (PFMC).

The Philadelphia Gas Works is a group of real and personal assets owned by the City of Philadelphia used and useful in the provision of gas services to City citizens.

The Philadelphia Gas Commission is an agency of the City of Philadelphia provided for by the Philadelphia Home Rule Charter at 351 Pa. Code §5.5-902. Its members are the City Controller, two persons appointed by City Council and two persons appointed by the Mayor. Its function is to oversee the operation of the Philadelphia Gas Works, including the rates to be charged for gas services.

PFMC is a non-profit corporation organized by the City for the specific purpose of operating the Philadelphia Gas Works.

The Philadelphia City Council by ordinance enacted December 29, 1972 approved an agreement of the same date between the City and PFMC comprehensively governing the operation of the Philadelphia Gas Works. Section VII concerns rates and provides pertinently as follows:

## SECTION VII

### Gas Rates

1. The rates for gas shall be continued as they exist at the commencement of operations under this Agreement and shall be changed by the Gas Commission when necessary so that they will produce revenues sufficient for the following purposes:

(a) To pay all of the costs and expenses of conducting Gas Works enterprise, including, but not limited to:

(i) All expenses of operation and maintenance of the Gas Works

(ii) Charges for depreciation as prescribed in Section IV 1.(b).

(iii) Charges for employees' retirement costs as prescribed in Section IV 1.(c).

(iv) A management fee to Company equal to the actual cost to Company of managing the Gas Works but not to exceed $200,000 annually. Gas Works shall make an initial payment to Company in the amount of $25,000 on or before January 1, 1973. Gas Works shall thereafter reimburse Company against vouchers on the first day of each calendar month for monies expended for the operation of the Gas Works in the previous calendar month.

(v) Expenses of the Gas Commission.

(b) To make base payments to the City, as follows:

|  | Calendar Year 1973 | Calendar Years Thereafter |
|---|---|---|
| February 1 | $4,000,000 | $4,000,000 |
| March 1 | $4,000,000 | $4,000,000 |
| April 1 | $4,000,000 | $4,000,000 |
| May 1 | $1,200,000 | $3,500,000 |

Additional payments are to be made at such times as conditions may warrant and as may

be determined and agreed upon by the Gas Commission and City Council.

(c) To provide appropriations for debt reduction and capital additions not otherwise provided which are determined by the Gas Commission to be reasonable and which are approved by City Council.

(d) To provide reasonable additions to the working capital as may be determined by Company and approved by the Gas Commission.

(c) Anything to the contrary herein contained notwithstanding, the Gas Works, as has been the custom under prior contracts, shall continue to pay out of its revenues all of these expenses set forth in this Subsection VII, and all other expenses necessary and proper to the operation of the Gas Works excepting only the Company's own personnel and administrative costs which are payable out of the management fee.

We deem it helpful to state at this point that the process of fixing rates described in Section VII—that is, by tailoring them to anticipated need for cash, including the preordained $15,500,000 yearly payment to the City—is called the cash flow method. The principal issue raised by the appellants in this case derives from their contention that there is no authority in Pennsylvania law for fixing utility rates by the cash flow method and that the only lawful method of fixing such rates is the familiar one of "calculating the fair value of a utility's property used and useful in public service (termed the 'rate base') and multiplying that amount by a percentage figure called 'rate of return' (most frequently determined by reference to the company's cost of capital)." *Keystone Water Company v. Pennsylvania Public Utility Commission*, 477 Pa. 594, 607, 385 A.2d 946, 953 (1978). The ap-

pellee, Philadelphia Gas Commission, answers, of course, that the cash flow method described in Section VII of the ordinance/agreement of December 29, 1972 is authorized by law.

In the spring of 1977, PFMC prepared Tariff No. 7 proposing increases in gas rates for the operating year July 1, 1977 to June 30, 1978 in the amount of $40,500,000, an amount which represented a 20.7% increase over existing rates. The major revenue requirements indicating the proposed increase were: (1) a plan to purchase an additional nineteen million gallons of oil as feedstock for manufactured gas, requiring an increase in working capital, and (2) a plan to pay the City of Philadelphia the sum of $7,500,000 during the year in addition to the $15,500,000 due during the year pursuant to Subsection VII(1)(b) of the ordinance/agreement of December 29, 1972. The additional $7,500,000 proposed to be paid to the City in 1977-1978 was a payment on account of a deficiency in the $15,500,000 payment due during the year 1976-1977 but paid only to the extent of $1,500,000.

The Philadelphia Gas Commission conducted hearings on the proposed Tariff and the budget of the Philadelphia Gas Works for 1977-1978 during May of 1977. As a result, it seems, of a letter of the Mayor to the members of the Philadelphia Gas Commission dated May 26, 1977, the Philadelphia Gas Commission approved an increase in rates in the reduced amount of $31,312,000, or 16% over the previously established rates. The amount of revenues needed was arrived at by the cash flow method described in Section VII of the ordinance/agreement of December 29, 1972.

The appellants commenced an action in equity attacking the new rates in the Court of Common Pleas of Philadelphia. On June 23, 1977, the court, apparently finding that notice of the hearings held was inadequate, directed the Philadelphia Gas Commission

to conduct new hearings. These were held in July 1977 and on July 28 the Philadelphia Gas Commission, as it had before, using the cash flow method, approved a rate increase of $31,312,000 or 16%, to become effective August 1, 1977. The appellants then filed a Petition for Review in the Court of Common Pleas to initiate an appeal pursuant to the Local Agency Law, then the Act of December 2, 1968, P.L. 1133, 53 P.S. §11301 et seq., now found at 2 Pa. C.S. §§101 et seq., 501 et seq. They also filed an amended complaint in their equity suit, seeking an order enjoining the rate increase approved on July 28, 1977. On May 12, 1978 the court below, which treated the matter as an appeal under the Local Agency Law, affirmed the Philadelphia Gas Commission's order.

As we have noted, the appellants urge that there is no lawful authority for the use of the cash flow method of establishing rates of any Pennsylvania utility. The Philadelphia Gas Works provides no service beyond the boundaries of Philadelphia. Therefore none of its public utility services were or are subject to regulation and control by the Public Utility Commission as was, at the time this case was decided, provided by Section 301 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1141, and as is now provided by 66 Pa. C.S. §1301.

The fair rate of return on fair value standard was that applied in all rate making proceedings conducted by the Public Utility Commission and its predecessor Public Service Commission in the ascertainment of whether rates proposed to be charged were "just and reasonable," as also required by Section 301, now 66 Pa. C.S. §1301. However, the same standard—fair return on fair value—was held by the Supreme Court to be the method required to be used by courts in ascertaining whether rates charged by municipally owned utilities not subject to PUC regulation were

just and reasonable when the issue was presented to courts of equity, pursuant to their jurisdiction conferred by the Act of June 16, 1836, P.L. (1835-1836) 785, 790, Section 13, 17 P.S. §§281, 282. *Shirk v. Lancaster City,* 313 Pa. 158, 169 A. 557 (1933); *see also Ambridge Borough v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 50, 8 A.2d 429 (1939).

In sum, the fair return on fair value method of establishing and testing the reasonableness of utility rates is required to be used with respect to the rates of utilities subject to PUC regulations and also with respect to the rates of municipal utilities not subject to PUC regulations when such rates are reviewed by courts in equity. The Philadelphia Gas Works, as we have noted, is not subject to PUC regulation. Therefore, absent other consideration, fair return on fair value would be the required measure for application. There is, however, other consideration present with respect to Philadelphia Gas Works; to wit, the fact that Philadelphia has Home Rule status by virtue of the First Class City Home Rule Act, Act of April 21, 1949, P.L. 665, *as supplemented and amended,* 53 P.S. §13101 et seq. Section 17 of the Act, 53 P.S. §13131, provides, subject to limitations not here pertinent, that a city accepting the Act "and framing and adopting or amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions . . . and may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers. . . ." Ordinances of the City of Philadelphia have the effect and force of an Act of Assembly. *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965). The ordinance/agreement of December

29, 1972 therefore has statutory effect and effectively overrules the holding of *Shirk v. Lancaster City, supra*, as it might otherwise have applied to the rates of the Philadelphia Gas Works. Section VII establishing the cash flow method therefore prevails.

The parties all agree that the rates for gas services in Philadelphia must be just and reasonable. Further, no objection has been made by either party to treating the matter as an appeal under the Local Agency Law; and, as we have noted, just such an appeal was filed by the appellants in the court below. We must therefore look to the Local Agency Law.

At the conclusion of the hearings conducted in July 1978 the Philadelphia Gas Commission adopted its order fixing the rates hereinbefore described, by voice vote. If this action was ever memorialized by written order, it is not in the record certified to us. It is clear, however, that a simple order approving the increase of rates in the amount of $31,312,000 or 16 percent over the previous year's rates was the only action taken by the Philadelphia Gas Commission. The Local Agency Law provided, and now provides at 2 Pa. C.S. §555, that "all adjudications of a local agency shall be in writing, shall contain findings and the reasons for the adjudication. . . ." Here there is apparently no writing and certainly no findings and no reasons stated by the Philadelphia Gas Commission for its conclusion that the increased rates were just and reasonable. Of course, without findings by the Philadelphia Gas Commission we do not know what evidence produced in the five days of hearings it believed reliable and without reasons for its adjudication we do not know why it concluded that the proposed rates were just and reasonable. We are therefore unable to review the Philadelphia Gas Commission's adjudication. *See West Penn Power Com-*

*pany v. Pennsylvania Public Utility Commission,* 33
Pa. Commonwealth Ct. 403, 381 A.2d 1337 (1978).

The appellants' brief raises questions concerning
the reasonableness of the new rates, such as: that
while from 1966 to 1976 the Gas Works' return on
book equity ranged from 8.3% to 12.3%, the projected
return after the increase here granted would amount
to 20.8%; that gas utilities subject to PUC regulation
are being allowed returns on equity investment in the
range of 13.43% to 13.93% compared to the Philadel-
phia Gas Works' apparent return of 20.8%; and that
the increase in rates will produce net income for the
year of about $30,000,000 before paying the City any-
thing pursuant to Subsection VII(1)(b) as compared
with the highest comparable figure for net income in
any previous year of about $17,000,000. It may well
be that these questions have ready answers in this
record and that it was these answers which compelled
the Philadelphia Gas Commission's adjudication. If
so, we must know what they are, if the court below,
and we on appeal, are to subject the Philadelphia Gas
Commission's adjudication to review as the law re-
quires.

We are therefore compelled to reverse the order
below and to remand the matter, with direction that
the Philadelphia Gas Commission prepare an adjudi-
cation conforming to the requirements of 2 Pa. C.S.
§555, after which the appellants may, if they desire,
renew their appeal to the court below.

ORDER

AND Now, this 24th day of August, 1979, the order
of the Philadelphia Gas Commission made July 28,
1978 is reversed and the record is remanded for prep-
aration of an adjudication by the Philadelphia Gas
Commission conforming to the requirements of 2 Pa.
C.S. §555.

244

CONCURRING OPINION BY JUDGE CRAIG:

Although I concur with the order of the court here, remanding the matter for a proper adjudication by the Philadelphia Gas Commission, I cannot agree with the majority opinion approval of the cash flow method for ratemaking. Nor can I concur with what I understand to be the majority's view as to the substantive criterion here, conformity only to the ordinance/agreement of the City of Philadelphia, dated December 29, 1972.

Even with the premise that this gas utility operation is under the home-rule powers of the City of Philadelphia, the gas utility rates cannot be said to be exempt from judicial review to ascertain and approve their reasonableness. Indeed, the majority opinion acknowledges that, after a proper adjudication has been rendered by the Philadelphia Gas Commission, the resulting rates continue to be subject to review by the court below and by this court. However, by stating that the "ordinance/agreement of December 29, 1972 therefore has statutory effect," I read the majority opinion to indicate that the courts are limited to determining whether or not the resulting rates conform to the terms of the ordinance/agreement.

Such a criterion would offer little protection for the rate-paying citizens of Philadelphia. If the City and the Philadelphia Gas Commission can get their heads together and determine that the rates will be set at a level sufficient to provide an annual payment of $15,500,000 to the city (including a catch-up payment of $7,500,000 currently at issue), and if the courts cannot look into the reasons for setting such a figure, to determine whether it is arbitrary or reasonably well-founded, then the rate-payers may well be subjected to an arbitrary levy, amounting to a hidden revenue source for the City and not a proper charge for gas service at all.

Although there is certainly no evidence in the record presently before us that the City of Philadelphia has determined that annual payment amount improperly or without a reasonable basis, it is not an unusual practice for municipalities in general to use municipal utility income in lieu of tax revenues.

At the very least, the annual City payment component of the rate here should be shown to have some rational relationship to the gas service supplied to those who pay, not just mere conformity to a figure established in an ordinance.

Finally, it is difficult to conceive how the reasonableness of rates can be determined at all, except in relation to a rate base consisting of a fair value of the property employed—as distinguished from a cash flow which may not have any relationship to the service rendered.

As the Supreme Court said in *Shirk v. Lancaster City*, 313 Pa. 158, 169, 169 A. 557, 562 (1933):

> It is only upon a fair value that the question of reasonable or oppressive rates can be determined.

Therefore, I cannot join in approving the cash flow method or the annual City payment component, absent a suitable justification of the reasonableness of the resulting rates in relation to the service rendered.