637 A.2d 676

**The PUBLIC ADVOCATE, Appellant,**

v.

**PHILADELPHIA GAS COMMISSION and Philadelphia Gas Works and Philadelphia Facilities Management Corporation,**

v.

**PHILADELPHIA GAS COMMISSION.**

Commonwealth Court of Pennsylvania.

Argued Oct. 6, 1993.

Decided Jan. 14, 1994.

430

Steven P. Hershey, for appellant.

Valoria L. Cheek for appellee Philadelphia Gas Com'n.

Steven L. Friedman for appellees Philadelphia Gas Works and Philadelphia Facilities Management Corp.

Andre C. Dasent for intervenor City of Philadelphia.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH, KELLEY, JJ.

CRAIG, President Judge.

The Public Advocate, Action Alliance of Senior Citizens, Consumer Education and Protective Association, and the Tenant Action Group appeal two orders of the Court of Common Pleas of Philadelphia County which 1) denied the Public Advocate's preliminary objections that challenged the standing of the Philadelphia Gas Works (PGW) and the Philadelphia Facilities Management Corporation (PFMC) to intervene in an appeal of a gas rate decision of the Philadelphia Gas Commission, and 2) reversed the rate-making decision of the commission.

The Public Advocate raises the following issues for review: 1) whether the payment of $18,000,000 to the city of Philadelphia from revenues of PGW is lawful; 2) whether PGW is a legal entity with standing to cross-appeal and intervene in this case; 3) whether PFMC has standing to cross-appeal and intervene in this case; 4) whether substantial evidence supports the commission's decision ordering PGW to reduce its expenses for fiscal year 1991–1992 by $1,280,000 in connection with Management Audit Action Plans 2, 7, and 8 (MAAPS); 5) whether the trial court improperly substituted its own judgment without deference to the commission's expertise; and 6) whether the use of a document characterized by the Public Advocate as a "script" during the commission's public meeting

held on December 19, 1991, violated the Sunshine Act, Act of July 3, 1986, P.L. 388, 65 P.S. §§ 271–286.

## FACTS

The facts are those averred in the pleadings. On July 16, 1991, PGW, which the city uses to provide citizens of Philadelphia with gas service, and which consists of real and personal assets that the city owns, filed its 1991–1992 fiscal operating budget request with the commission, requesting a $31,000,000 base rate increase for 1991–1992. PGW later amended its rate increase request to $28,000,000.

The commission held formal hearings on the proposed rate increase. PGW, the city, and Community Legal Services (Public Advocate), which the commission had appointed as public advocate to represent PGW's residential ratepayers, were parties to those proceedings.

In an order dated December 19, 1991, the commission granted PGW a $15,032,000 rate increase and denied $12,968,-000 of the requested increase.

The Public Advocate, along with three other community consumer groups—Action Alliance of Senior Citizens, Consumer Education and Protective Association, and the Tenant Action Group—appealed the commission's decision to the trial court.

PFMC, a non-profit corporation which the city chartered to manage PGW, had entered into an agreement with the city in 1972, which the Philadelphia City Council embodied in Ordinance No. 455 of 1972. That ordinance gives PFMC the right to manage and operate PGW for the benefit of the city. The ordinance also gives the commission the authority to fix and regulate gas rates in order to produce revenues for the city that are sufficient to cover operating and personnel costs, depreciation, management fee, sinking fund charges, *and also* to make base payments to the city in an annual amount of $18,000,000.

After the Public Advocate filed suit with the trial court, PFMC and PGW filed a notice of cross appeal and a notice of intervention with that court. The city, as owner of PGW, filed a notice of intervention with the trial court.

The Public Advocate filed preliminary objections to the notice of cross appeal, contending that PGW and PFMC did not have standing to appeal the commission's decision. The trial court denied the preliminary objections.

The trial court affirmed the commission's decision in part, reversed one aspect of the decision, and remanded the commission's decision in part, concluding that 1) the commission did not violate the Sunshine Act, 2) the commission erred in reducing PGW's rate relief by $1,280,000 based on implementation of MAAPS 2, 8, and 7, and 3) PGW's annual payment to the city of $18,000,000, as required by the 1972 ordinance, did not violate the Pennsylvania Constitution or Pennsylvania law.

The Public Advocate appealed the trial court's decision to this court.

■ Where, as in this case, a complete record was developed before a local agency, this court's scope of review of an order of the trial court involves determining whether constitutional rights were violated, whether an error of law was committed, or whether findings of facts are supported by substantial evidence. *McKeesport Area School District Board of Directors v. Collins,* 55 Pa.Commonwealth Ct. 548, 423 A.2d 1112 (1980).

## ANALYSIS

### 1. Standing of PGW and PFMC

■ The Public Advocate argues that PGW lacks an actual legal existence as either a natural or artificial person, and therefore lacks the capacity to appeal or intervene in this case. The Public Advocate contends that PGW is merely a collection of assets owned by the city, and under *Philadelphia Facilities Management Corporation v. Biester,* 60 Pa.Commonwealth Ct.

366, 431 A.2d 1123 (1981), may not be a party to any court action.

However, *Biester* is distinguishable from this case because this court held in *Biester* that PGW does not have standing as a legal entity to be a party-plaintiff and bring suit on its own behalf or on the behalf of its customers *challenging the constitutionality of an Act.*

In this case PGW sought to cross-appeal and intervene in proceedings to which it was a party before the commission. The trial court correctly noted that the Public Advocate waived its right to object to PGW's standing because it made no objection to PGW's participation in the proceedings before the gas commission, and 2 Pa.C.S. § 753 bars the introduction on appeal of any issue not raised before the agency.

The Public Advocate also contends that PFMC also does not have standing to cross-appeal from the commission's decision or to intervene in this case.

Under 2 Pa.C.S. § 752, "any person aggrieved by an adjudication of a local agency who has a direct interest in such adjudication shall have the right to appeal therefrom...." 2 Pa.C.S. § 101 defines "person" to include government units, or agencies of the federal Government. A "government agency" under that section is "any commonwealth agency or any political subdivision or municipal or other local authority, or any officer or agency of any such political subdivision or local authority."

The Public Advocate concedes that, as a non-profit corporation, PFMC is a legal entity. However, the Public Advocate argues that, under *Biester, supra,* PFMC's managerial role as to PGW is not enough to give it a "direct interest" which would allow PFMC to cross-appeal or intervene in this case.

This court held in *Biester* that PFMC did not have a direct interest to challenge the constitutionality of a statute. However, as stated above, *Biester* is distinguishable from this case. Because, in this case, PFMC, as the manager of the assets of PGW, has a direct interest in the rates charged by PGW, that interest is not too remote for the purposes of this proceeding.

Thus, this court concludes that PGW and PFMC have standing to intervene in this suit.

### 2. Sunshine Act Violation

■ The Public Advocate argues that the trial court erred in rejecting the Public Advocate's claim that, because the chairman of the commission used a lengthy document which the Public Advocate alleges was a "script," at the commission's December 19, 1991 adjudication of the rate increase case, the commission violated the Sunshine Act, supra, which grants the public the right to witness and evaluate the actions of agencies and public officials in Pennsylvania.

Section 272 of the Act states:

(a) Findings.—The General Assembly finds that the right of the public to be present at all meetings of agencies and to witness the deliberation, policy formulation and decision-making of agencies is vital to the enhancement and proper functioning of the democratic process and that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society.

(b) Declarations.—The General Assembly hereby declares it to be the policy of this Commonwealth to insure the right of its citizens to have notice of and the right to attend all meetings of agencies at which any agency business is discussed or acted upon as provided in this act.

The Public Advocate contends that the document which the commissioner used at the meeting showed that the commission had already discussed and resolved the issues involved at the meeting and had reached an agreement as to their resolution *before* the meeting. As such, the Public Advocate argues that the commission violated the Sunshine Act because, under that Act, the public has a right to see an agency's decision making process. *See Babac v. Pennsylvania Milk Marketing Board,* 136 Pa.Commonwealth Ct. 621, 584 A.2d 399 (1990).

In the present case, the document in question contains a detailed description or outline of the December 19th meeting,

with proposed motions by the chairman of the commission. For example, page three of the document states:

> I WOULD LIKE TO PROPOSE THE FOLLOWING MOTION:
>
> I MOVE THAT THE COMMISSION ADOPT THE FOLLOWING POSITIONS.
>
> WHEN A CHANGE IS PROPOSED TO PGW'S BUDGET IT IS BEING MADE TO PGW'S AUGUST 9, 1991 FILING AS AMENDED BY THE GCR STIPULATION:
>
> 1. ACCEPT THE ADVOCATES POSITION REGARDING MAAPS 2 AND 8 AND REDUCE EXPENSES BY $1,000,000.
>
> 2. ACCEPT THE ADVOCATE'S POSITION REGARDING MAAP 7 ADJUSTED FOR THE 12/31/91 COMPLETION DATE SET IN THE APPROVED MAAP AND REDUCE EXPENSES BY $280,000. (RR. 32)

The trial court concluded that the above document was an "agenda" and not a script, and noted that the document merely contained, along with the motions, proposed statements and proposed resolutions which any chairman would, in preparation for a case such as the rate increase case, prepare in advance of such a meeting.

In an action alleging violation of the Sunshine Act, the burden of proof is upon the challenger, in this case the Public Advocate, to prove that official non-public deliberations took place before the public meeting. *Bradford Area Education Association v. Bradford Area School District*, 132 Pa.Commonwealth Ct. 385, 572 A.2d 1314 (1990).

After reviewing the document which the Public Advocate alleges the commission used a "script" in violation of the Sunshine Act, this court concludes that the Public Advocate has failed to meet its burden of proof that the commission had decided the issues of the December 19th meeting before that meeting took place.

### 3. Constitutionality of Payment of $18,000,000 of PGW Revenues to the City of Philadelphia

The Public Advocate argues that Ordinance 455's requirement of an annual payment of $18,000,000 to the city from PGW's revenues is improper because that payment 1) does not have a rational relationship to the gas service which PGW supplies, 2) violates just and reasonable rate standards, 3) is an unlawful taking, and 4) is an illegal payment in lieu of a tax that violates the Uniformity Clause of Article 8, Section 1 of the Pennsylvania Constitution.

Section VII(1)(a) of the ordinance requires the commission to fix gas rates which will produce revenues:

a. Sufficient to pay all of the operation and maintenance costs and expenses of conducting the Gas Works enterprise and to pay the interest and amortization becoming due in each fiscal year on debt incurred for the Gas Works, including, but not limited to:

(i) Charges for depreciation as prescribed in Section IV 1.(b);

(ii) Charges for employees' retirement costs as prescribed in Section IV 1.(c);

(iii) A management fee to Company equal to the actual cost to company of managing the Gas Works but not to exceed $300,000 annually, effective as of January 1, 1979, and for all years thereafter. The Gas Works shall reimburse Company against vouchers on the first day of each calendar month for monies expended for the operation of the Gas Works in the previous calendar month.

(iv) Expenses of the Gas Commission; and

(v) All sinking fund charges payable in respect of principal and interest on all obligations of the City issued for or with respect to the Gas Works Revenue Bonds issued pursuant to The First Class City Revenue Bond Act, such additional amount as may be required to comply with any rate covenant and sinking fund reserve requirement ap-

proved by ordinance of City Council in connection with the authorization or issuance of Gas Works Revenue Bonds.

Section VII(1)(b)(i) requires that the rate also be sufficient:

> b. To make base payments to the City in the aggregate annual *principal* (Emphasis in original.) amount of $18,000,-000 payable in the amount of $4,500,000 on each February 1, March 1, April 1, and May 1, provided that the Gas Works may defer this payment to any time between said due date and June 30 of each year in which event it shall be assessed interest on the principal amount of prevailing rates, to be determined by the Director of Finance and the Gas Works, from the said due date of the date of payment or such different amounts at such different times, not greater in annual aggregate principal amount, as City Council shall prescribe.

Section VII(5) provides that:

> In the determination of rate schedules for gas, the Gas Commission shall establish and apply non-discriminatory rates based on suitable and reasonable classification of the services provided, taking into consideration the preparation of such schedules, the nature and purpose of the use, the quantity used, the time of year when used, the available supply of gas and other competing fuels, the maximum demand, and such other factors, including state, and federal laws, regulations or guide lines, as may be appropriate to the economics of the purchase, manufacture, distribution and sale of gas and consistent with the intent and purpose of this ordinance and/or Agreement. Such rates may provide for sufficient revenue to stabilize them over a reasonable number of years. (RR. 3)

In *Action Alliance of Senior Citizens v. Philadelphia Gas Commission,* 45 Pa.Commonwealth Ct. 234, 406 A.2d 1155 (1979), this court upheld the above method of establishing gas rates for the PGW under section VII of the 1972 ordinance,[1]

---

1. However, in *Action Alliance,* the ordinance required that PGW pay base rate fixed payments of $15,500,000 to the city, and not $18,000,-000, which the ordinance now requires. The amount of $15,500,000 was increased to $18,000,000 by ordinance in 1980.

which is called the cash flow method. As shown above, the cash flow method involves fixing gas rates by tailoring the rates to PGW's anticipated need for cash, which now includes the base rate payment of $18,000,000 to the city.

The *Action Alliance* court noted that the Pennsylvania Public Utility Commission uses a "fair return on fair value" method in ascertaining whether the rates charged by utilities that the PUC regulates are "just and reasonable." *Id.* at 240, 406 A.2d at 1158. That method involves " "calculating the fair value of a utility's property used and useful in public service (termed the 'rate base') and multiplying that amount by a percentage figure called 'rate of return' (most frequently determined by reference to the company's cost of capital)." " *Id.* at 238, 406 A.2d at 1157, quoting *Keystone Water Company, White Deer District v. Pennsylvania Public Utility Commission,* 477 Pa. 594, 607, 385 A.2d 946, 953 (1978).

The *Action Alliance* court noted that, because PGW, as a *municipally owned utility,* provides no service beyond the boundaries of Philadelphia, the PUC does not regulate or control PGW.

However, that court also noted that, in *Shirk v. Lancaster City,* 313 Pa. 158, 169 A. 557 (1933), the Pennsylvania Supreme Court held that courts must use the fair return on fair value method in determining whether rates charged by *municipally owned utilities* which are not subject to PUC regulation, such as the PGW, are just and reasonable.

In *Shirk,* the Supreme Court noted that the fair return method involves calculating the value of the property used and useful in connection with the service the municipally owned utility provides. The court noted:

It is only upon a fair value that the question of *reasonable or oppressive* rates can be determined. When the entire scheme of municipal water rates is under review by a court, it cannot tell whether the "acts" of the municipality are "contrary to law, prejudicial to the interests of the community or the rights of individuals" (Act of 1836), without a knowledge of the *value of property involved.*

*Id.* at 169, 169 A. at 562. (Emphasis added.)

The court noted that, in determining rates, the value of the property used should include operating cost, and many other elements such as depreciation. The court noted that municipally owned utilities are entitled to make a profit in the same way that private corporations do. *Id.*

The *Shirk* court then noted that, once an administrative rate-making body calculates a sum sufficient to cover operating expenses and other contingencies under the above method of calculating rates, the utility would be allowed, *in addition,* a *fair return on the present value of the property, Id.* at 171, 169 A. at 563, specifically, a figure which represents a given percentage on the fair value. The court noted that this fair return would cover "such items as interest and sinking fund or other debts and dividends." *Id.*

In summarizing the "fair return on fair value" method, the court held:

(a) The present fair value of the entire plant should be ascertained and that part used or useful in service outside the city deducted.

(b) A sum should be ascertained to cover operating expenses and contingencies; there should be deducted from it that portion necessary to service out side the city.

(c) A depreciation charge should be set up.

(d) It must then be ascertained whether the rates as fixed after allowing for (b) and (c) yield more than the fair return permitted on the present value of the plant to incorporated water companies as fixed by the public service commission and this court ... If it does, the amount of return allowable should be stated, and the city should be directed to adopt a schedule of rates within that sum and items (b) and (c).

(e) Debt service charges, as discussed, may be compensated from such return.

(f) Governmental expenses may be paid from the residue unless it manifestly prejudices a portion of the taxpayers.

*Id.* at 174, 175, 169 A. at 564.

In *Action Alliance, supra,* this court distinguished the holding in *Shirk,* that the fair return on fair value method

applied to municipally owned utilities, concluding that such a holding did not apply to PGW because of Philadelphia's status as a home-rule municipality under the First Class City Home Rule Act, Act of April 21, 1949, P.L. 665, *as supplemented and amended,* 53 P.S. § 13131. Section 17 of the Act gives cities like Philadelphia, which have framed, adopted, or amended its charter, all the powers and authority of local self-government, which includes enacting ordinances. This court noted that ordinances which the city of Philadelphia enacts, have the full force and effect of a statute. *Action Alliance,* 45 Pa.Commonwealth Ct. at 242, 406 A.2d at 1158 citing *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965).

Thus, the *Action Alliance* court held that, because the 1972 ordinance had the effect of a statute, section VII of the ordinance which establishes the cash flow method, prevailed over the *Shirk* court's directive to use the fair return method of calculating gas rates.

The "concurring in result only" opinion in that case states:

Even with the premise that the gas utility operation is under the home-rule powers of the City of Philadelphia, the gas utility rates cannot be said to be exempt from judicial review to *ascertain and approve their reasonableness.* Indeed, the majority opinion acknowledges that, after a proper adjudication has been rendered by the Philadelphia Gas Commission, the resulting rates continue to be subject to review by the court below and this court. *However, by stating that the "ordinance/agreement of December 29, 1972 therefore has statutory effect," I read the majority opinion to indicate that the courts are limited to determining whether or not the resulting rates conform to the terms of the ordinance/agreement.*

Such a criterion would offer little protection for the ratepaying citizens of Philadelphia. If the City and the Philadelphia Gas Commission can get their heads together and determine that the rates will be set at a level sufficient to provide an annual payment of $15,500,000 to the city ... and if the courts cannot look into the reasons for setting

such a figure, to determine whether it is *arbitrary or reasonably well-founded,* then the rate-payers may well be subjected to an arbitrary levy, amounting to a hidden revenue source for the City and not a proper charge for gas service at all.

*Action Alliance,* 45 Pa.Commonwealth Ct. at 244, 406 A.2d at 1159. (Emphasis added.)

The concurring opinion stated that, at the very least, the court should determine whether the base rate payment to the city has a rational relationship to the gas service which PGW supplies to its customers. *Id.*

In *American Airline Products, Incorporated v. Lock Haven,* 288 Pa. 420, 135 A. 726 (1927) the Pennsylvania Supreme Court held that although the Public Service Commission (now the PUC) could not regulate the rates charged by municipalities

[t]his does not mean that cities engaged in the business of supplying water are not subject to any control. Courts have the power to determine questions relating to service and rates where a complaint is based on "reasonableness of the ordained rate or the justness of their application," or discrimination amounting to confiscation. "It is not competent for the State to enact *that the rates [for public utilities] fixed either by the legislature or by a commission or municipality, . . . . . . are conclusive . . . . . .; for such an act would be unconstitutional because it denies to the party affected due process of law, and, by depriving it of the lawful use of its property, it in substance and effect deprives it of the property itself, and of the equal protection of the laws contrary to the express provisions of the 14th Amendment. . . . . . ."*

*Id.* at 424, 135 A. at 727, quoting *Barnes Laundry Company v. Pittsburgh,* 266 Pa. 24, 109 A. 535 (1920).

In *In re Petition of City of Philadelphia,* 340 Pa. 17, 16 A.2d 32, (1940), the Pennsylvania Supreme Court struck down an ordinance enacted by the City of Philadelphia pursuant to a

Sewer Rental Act, which empowered municipalities to impose a rental charge for use of the cities' sewer facilities.

The court held that 1) the city could only impose a rental charge for use of the sewer facility upon those who *actually* used the sewer facility, and 2) the rental charge had to be reasonably proportional to the value of service rendered.

The court held that the Sewer Rental Act did not authorize the city to enact an ordinance requiring rental payment for the sewer system from 1) vacant lots not connected to the system but abutting it, 2) vacant lots connected to the system but not using it, 3) vacant buildings not connected with the system but abutting on it, 4) vacant buildings connected with the sewer system but not actually using it, 5) occupied buildings not connected to the system but abutting, and 6) properties directly or indirectly discharging surface water into the system.

The court noted that:

While we are fully cognizant of the practical difficulties involved in the situation with which the City is confronted, we are nevertheless duty bound to judge the ordinance of August 1, 1940, by its *legal effect and not by statements as to what is proposed to be done therein or otherwise.*

. . . . .

It is noteworthy in this connection that, as stated in *Williams v. Samuel, supra,* 332 Pa. at page 268, 2 A.2d 834, a large part of the cost of the sewer system of the City of Philadelphia was raised by assessments against abutting property owners. *Being imposed without regard whatever to the extent or value of the use made of the sewer facilities, or whether any use is made, the charge provided for by the ordinance is, in legal effect, undoubtedly a tax, and the obligation to pay it could be created only by the City's exercise of its general taxing power.*

*Id.* 340 Pa. at 24, 16 A.2d at 35. (Emphasis added.)

### a. Cash Flow Method

██ This court notes that the cash flow method and the fair return method of calculating rates use similar variables to

calculate anticipated need of funds for a public utility. For example, under both methods, a calculation of rates involves taking into consideration operation and maintenance costs for the utility, as well as other contingencies such as depreciation. The main difference between the two methods is the fact that, under the fair return method, PGW would be allowed an additional sum sufficient to constitute a reasonable return upon the present value of the property. As stated above, that additional sum covers such items as interest, sinking fund, or other debts of the utility. However, section VII of the 1972 ordinance also allows amounts to cover sinking fund and debt of the utility.

This court, in reviewing the 1972 ordinance, in light of its effect as a statute, with the exception of the fixed $18,000,000 requirement, concludes that, under *American Airline, supra*, the cash flow method is a reasonable way of establishing gas rates, because rates are reasonable if in fact they are correctly set to obtain revenues required to cover all necessary expenditures.

### b. Fixed Base Payments of $18,000,000

The city argues that the fixed $18,000,000 amount which the ordinance requires is reasonable because 1) it represents a "fair return" on the investment of the city into PGW, 2) the city has a right to charge a rate that will pay a return, even if that includes a profit, and 3) the ratepayers enjoy significant benefits as a result of the city's ownership of PGW.

■ In the hearings before the commission, the city testified as follows:

Q. Can you tell us what capital the City has put up to acquire PGW any time in the last one hundred years?
A. I can't speak for the last 100 years. The equity in the assets of the Gas Works are by definition the assets of the City, and the City's contribution to acquiring that equity is through the—whether the contributions were made many years ago or even in recent times, the title to those assets resides in the city.

Q. Well, now, I am not asking you about the legal title. I am asking you to identify any payments within your knowledge that were made by the City of Philadelphia to acquire this property.

. . . . .

Q. So the answer is that you are not aware of any payments made by the city?

Mr. Friedman: Excuse me. At this time I am going to move—

A. That's right.

. . . . .

Q. Mr. Brenner, are you aware of any payments made by the City to acquire these assets?

A. I am not aware of any personally, no.

. . . . .

Commissioner Bullock: Well, why don't you just get them to stipulate to the fact that they've borrowed money and done other things and got money from ratepayers to do this?

Mr. Hershey: We have tried that in the past and they wouldn't. (RR–24, 1324–1329)

The record thus reflects that, although the city's balance sheet shows a net city equity of $201,951,000 in the gas works, that amount cannot be said to have come directly from the city's own funding. Thus, the city cannot use the claimed "net equity" amount to justify the fixed $18,000,000 requirement in the ordinance.

■ In addition, the city attempts to justify further the fixed amount by pointing to certain benefits which the ratepayers receive as PGW customers.

For example, the city asserts that PGW has the capability to issue tax-free bonds through the city, which saved the ratepayers an estimated $10,500,00 in interest payments for 1991–1992, because of the lower interest rates at which tax-free bonds can be sold. In addition, the city claims that because the city owns PGW, PGW is exempt from state and

federal income tax, public utility realty tax, and gross receipts tax on gas revenues, which confers millions of dollars of benefits upon the rate payers.

However, although there are benefits which result from PGW being a city-owned facility, the $18,000,000 figure is a fixed amount, which, under the ordinance, is not calculated based on any benefits which the PGW customers actually receive. That figure is arbitrary in light of the fact that there is no actual relationship between that amount and any benefits conferred upon the rate payers. Although the commission required the city to produce documentary evidence of its need for a rate increase for fiscal year 1991–1992, there was no required justification for the fixed $18,000,000 amount because that amount is set by the ordinance.

Also, the city cannot attempt to justify the $18,000,000, to which *all* of the ratepayers must contribute, based on tax-free bonds which it issues to its customers, unless *all* of its customers make use of that benefit.

█ In addition, although the *Shirk* court recognized the fact that a municipally owned utility, like a corporation, may make a profit, that court used the fair return on fair value method and subtracted the present value of the utility from the sum which covered the operating costs and other contingencies, in arriving at the profit. Without using that method or a similar method, it is difficult for the city to claim that it is entitled to the $18,000,000 amount solely because the city is entitled to make a profit. Without a method of calculating profit, that fixed amount cannot be said to be an actual profit, and thus is arbitrary.

With the exception of the required fixed $18,000,000 amount under section VII of the ordinance, the requirement of rate increases based on operating expenses and other contingencies have a rational relationship to PGW's performance and use.

█ This court concludes that, under *In Re Petition, supra,* the provision in the 1972 ordinance which requires a fixed base rate amount of $18,000,000 to be paid to the city, cannot be said to be proportionate to the ratepayers' use of PGW, and

hence, the *legal effect* of that payment is a tax. However, the obligation to pay such a tax can only be created through the city's exercise of its taxing power, which is granted and limited by the Uniformity Clause of the Pennsylvania Constitution.

Thus, this court overrules the holding in *Action Alliance, supra,* insofar as it upheld a fixed amount of $15,500,000 in the city's 1972 ordinance.

### 4. The Management Audit Action Plans (MAAPS)

 The Public Advocate contends that the trial court erred in reversing the commission's decision ordering PGW to reduce expenses for the 1991–1992 fiscal year by $1,280,000 with respect to MAAPS 2 and 8 (which are usually read together), and MAAP 7, because there was substantial evidence to support the commission's decision.

The MAAPS are plans which were proposed by an outside accountant for the 1988–1989 fiscal year rate case. The proposed plans, if implemented, were estimated to save PGW money by reducing PGW's operating expenses. The commission adopted fifty-two of fifty-seven proposed MAAPS in October of 1991, and adopted all fifty-seven MAAPS in December of 1991.

The chart below reflects the summarized projected savings which MAAPS 2, 8, and 7 project for each year of implementation of each MAAP:

| Benefits— | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| MAAP2— | 0 | $325,000 | $650,000 | $650,000 |
| MAAP8— | $675,000 | $675,000 | $675,000 | $675,000 |
| MAAP7— | $420,000 | $420,000 | $420,000 | $420,000 |
| TOTAL— | $1,095,000 | $1,420,000 | $1,745,000 | $1,745,000 |

(RR. 14)

Thus, MAAPS 2 and 8, and MAAP 7, project anticipated savings of 1) $1,095,000 after the first year (Year 1) of implementation, 2) $1,420,000 after the second year (Year 2) of implementation, 3) $1,745,000 after the third year (Year 3) of

implementation, and 4) $1,745,000 after the fourth year (Year 4) of implementation.

Section B of MAAP 2 states:

B. *Benefit Analysis*

Schumaker & Co. anticipate $650,000 or more in annual *recurring* savings, as detailed in the audit report. These savings are based on reductions in the number of management positions and an overall increase in the span of control. (RR–14 p. 5) (Emphasis added.)

The commission interpreted the term "recurring" to mean that the same amount of savings would *occur again* as new savings in each year of implementation of the MAAPS. Thus, in the commission's view, the *total* savings projected in the chart above in each year of implementation of the MAAPS represents full *additional* amounts to be saved in each year.

In a February 5, 1991 order, the commission ordered that PGW reduce its operating expenses for fiscal year 1990–1991 (Year 1 above) by $1,000,000 to reflect anticipated savings from implementing MAAPS 2, 8, and 7. The commission ordered a further reduction in expenses of $1,280,000 [2] for fiscal year 1991–1992 (Year 2 above), which is the subject of this appeal, to reflect anticipated savings under MAAPS 2, 8, and 7 for that year.

PGW and PFMC argued before the trial court, as they do in this appeal, that 1) the commission erred in directing PGW to reduce its expenses in Year 2 (1991–1992) by $1,280,000 with respects to MAAPS 2, 8, and 7, and 2) by ordering this additional amount, the commission *double-counted* in reducing PGW's allowable rate relief.

PGW and PFMC argue that the $1,000,000 savings which the commission imputed to MAAPS 2, 8, and 7 from Year 1

---

2. The commission arrived at an anticipated *total* savings of $1,280,000 for Year 2, and not $1,420,00, as reflected in the chart above, because the commission did not add the full amount of projected savings for MAAP 7, and instead used two-thirds of the projected amount of $420,000 for Year 2, MAAP 7, because the commission reasoned that MAAP 7 was not to be completed until December 31, 1991, and thus a two-third figure was appropriate for fiscal year 1991–1992.

(1990–1991) are *embedded* in PGW's gas rates from that year, and the commission could only order PGW to implement an additional $420,000 reduction in expenses in Year 2 (1991–1992), i.e. $1,420,000 (projected total savings by Year 2)—$1,000,000 (saving which the commission included in the gas rates for Year 1).

PGW and PFMC thus interpret a *recurring* savings plan to mean that the projected savings from implementation of the above MAAPS 1) reflect a reduction of expenditures in the first year so that in subsequent years, the expenditures so reduced would remain at a reduced level, and 2) should not be *further reduced* by an additional *total* amount reflected in the MAAPS for the next year, but by an additional *incremental* amount arrived at by subtracting the reduced amount in the preceding year from the total amount projected by the MAAPS in the subsequent year.

This court concludes that PGW and PFMC's interpretation of *recurring* savings is correct. The savings reflected in the three MAAPS, once achieved, continue to have effect not by way of an additional reduction of the *total* amount of savings reflected in those MAAPS for subsequent years, but by an additional *incremental* amount in each year.

The trial judge reached the same conclusion, and, after reviewing the record, concluded that the commission had made a "mathematical error" in interpreting and calculating the rate increase for Year 2, under MAAPS 2, 8 and 7.

The trial court explained its reasoning clearly with the aid of an illuminating tabulation. (See Exhibit A, Appended to this Opinion, from Trial Court's October 16, 1992 Opinion, R. 26, p. 21) The trial court's well-reasoned analysis states:

### *MAAPS 2, 8, and 7*

. . . . .

The Gas Commission's mathematical error can be best understood by reference to the chart attached hereto as Exhibit A. The figures on this chart are taken directly from the MAAPS. (JRR 14).

The benefit figures projected by the MAAPS are clearly set forth in terms of "annual recurring savings." For example, MAAP 7 expressly sets forth that "PGW should anticipated *quantifiable recurring savings of approximately $420,000* (emphasis added) from the program...." (JRR 14)[3] What this means is that if, for example, MAAP 7 is implemented in Year 1 (ie. fiscal 1990–1991), PGW's expense will decrease by $420,000 as compared with the year immediately prior to Year 1 (hereinafter "Year 0"), and in Year 2 (i.e. fiscal 1991–1992) PGW's expense will remain $420,000 less than they were in Year 0. The Gas Commission erroneously assumed, in effect, that if MAAP 7 were implemented in Year 1, that PGW's expenses would by the end of Year 2 be $860,000 less that they were in Year 0. This assumption is plainly erroneous.

Accordingly, having ordered PGW to implement MAAPS 2, 8 and 7 for fiscal year 1990–1991 (Year 1) and to reduce its expenses by $1,000,000 to reflect this implementation, there was only $420,000 of additional savings as compared with Year 0 that these MAAPS would produce in fiscal year 1991–1992 (Year 2)—i.e. $95,000 from Year 1 and $325,000 for Year 2. The Commission's order requiring PGW to reduce its expenses as a reflection of these MAAPS by $1,280,000 for fiscal 1991–1992 (Year 2) was an expense reduction of *$860,000 more than the reduction which the MAAPS themselves forecast.* (Emphasis added.) This mathematical error must be corrected.

(Trial Court's October 16, 1992 Opinion) (R. 26, p. 12–13).

This court agrees with the trial court's analysis and notes specifically that MAAPS 2 and 7's statement that *total recurring savings of $650,000 and $420,000,* respectively, are anticipated from the implementation of those MAAPS, supports the conclusion that "recurring savings" mean "incremental" and not "additional total" anticipated savings.

3. Footnote 4 of the opinion states:
 MAAP 2 also states that *"$650,000 or more in annual recurring savings"* (emphasis added.) are anticipated. (JRR 14)

Thus, this court concludes that the trial court did not err in 1) concluding that the commission committed a mathematical error in requesting that PGW reduce its expenses under the above three MAAPS in an additional amount of $1,280,000 for Year 2 (1991–1992 fiscal year), and 2) ordering a correction of the mathematical error.

Accordingly, the decision of the trial court is affirmed in part and reversed in part, and this case is remanded to the commission to re-calculate PGW's rate increase request for fiscal year 1991–1992 without the required base payment to the city of Philadelphia in the amount of $18,000,000, under section VII of Ordinance 455.

This decision was reached before the conclusion of Judge PALLADINO's service.

| MAAP # | A Annual Recurring Savings (as Compared with Year 0) During Year 1 (i.e. Fiscal 1990–1991) | B Annual Recurring Savings (as Compared with Year 0) During Year 2 (i.e. Fiscal 1991–1992) |
|---|---|---|
| 2 | –0– | $ 325,000 |
| 7 | $ 420,000 | $ 420,000 |
| 8 | $ 675,000 | $ 675,000 |
| (i) Total Recurring Savings as Compared with Year 0 | $1,095,000 | $1,420,000 |
| (ii) Additional Recurring Savings as Compared with Previous Year | $1,095,000 | $ 325,000 |
| (iii) Savings Ordered by Gas Commission | $1,000,000 | $1,280,000 |
| (iv) Savings not Ordered by Gas Commission— Available to be Carried to Following Year (i.e. A(ii) Less A(iii)) | $ 95,000 | N/A |

| | | | |
|---|---|---|---|
| (v) | Savings Available to be Ordered by Gas Commission (i.e. A(iv) Plus B(ii)) | N/A | $ 420,000 |
| (vi) | Savings Ordered by Gas Commission in Excess of those Anticipated by MAAPs (i.e. B(iii) less B(v)) | N/A | $ 860,000 |

Exhibit "A"

## ORDER

NOW, January 14, 1994, the decision of the Court of Common Pleas of Philadelphia County, dated October 16, 1992, at No. 2961, is affirmed in part and reversed in part, and this case is remanded to the commission to re-calculate PGW's rate increase request for fiscal year 1991–1992 without the required base payment to the city of Philadelphia in the amount of $18,000,000, under section VII of Ordinance 455.

Jurisdiction relinquished.

COLINS, Judge, concurring and dissenting.

I must respectfully disagree with the conclusion of the majority that the $201,951,000 of net equity reflected on the City's balance sheet cannot be concluded to have come directly from the City's own funding. These capital assets are owned by the City, because PGW is owned by the City.

To analogize this to a private utility proceeding, the rate base of PGW is approximately $202,000,000. Therefore, the $18,000,000 payment would represent a little less than a nine percent rate of return on the utility's investment. Such a rate cannot be said to be arbitrary or unreasonable per se.

I concur with the remainder of the scholarly opinion of the majority.