674 A.2d 1056

**The PUBLIC ADVOCATE, Appellee,**

**v.**

**PHILADELPHIA GAS COMMISSION and Philadelphia Gas Works and Philadelphia Facilities Management Corporation, Appellants.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1995.

Decided April 22, 1996.

---

130

Bruce W. Kauffman, Steven L. Friedman, Public Gas Works, Thomas E. Groshens, Steven B. Goodman, Richard Fader, City of Philadelphia, Joseph A. Dworetzky, City Solicitor, Philadelphia, for Appellants.

Stephen P. Hershey, Kimberly K. Hudson, The Public Advocate, Carl E. Singley, Valoria L. Cheek, Gas Commission, Philadelphia, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

CASTILLE, Justice.

The issue before this Court is whether the fixed annual $18,000,000 payment by the Philadelphia Gas Works ("PGW") to the City of Philadelphia ("City"), as required by a 1972 City ordinance, is constitutional and can be included in the calculation of PGW's rate increase for fiscal year 1991–92. For the reasons expressed below, we believe this payment is constitutional, and therefore, we reverse the order of the Commonwealth Court which remanded this matter to the Philadelphia Gas Commission ("Gas Commission") to re-calculate PGW's

rate increase request for the 1991–92 fiscal year without the required payment to the City.

PGW is a municipal utility wholly owned by the City. PGW is comprised of real and personal assets used to manufacture and deliver natural gas to citizens residing within the borders of the City.

Since PGW does not provide gas service beyond the City's borders, its rates are not regulated by the Pennsylvania Public Utility Commission ("PUC").[1] Instead, PGW's rates are regulated and approved by the Gas Commission. The Gas Commission is an agency of the City established pursuant to Section 3–909 of the Philadelphia Home Rule Charter.[2]

In 1972, Philadelphia Facilities Management Corporation ("PFMC"), a non-profit corporation, entered into an agreement with the City to manage and operate PGW for the benefit of the City. Philadelphia City Council embodied this agreement in Ordinance No. 455 of 1972. Section VII of the ordinance gives the Gas Commission the authority to fix and regulate gas rates, and provides in pertinent part as follows:

Section VII

Gas Rates

1. The Gas Commission shall fix and regulate rates and charges for supplying gas to customers . . ., without further

**1.** Section 1301 of the Public Utility Code provides:

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. Only public utility service being furnished or rendered by a municipal corporation, or by its operating agencies of any municipal corporation, beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility.
66 Pa.C.S. § 1301.

**2.** Section 3–909 of the Home Rule Charter provides:

The Gas Commission shall be constituted and appointed in accordance with the provisions of such contract as may from time to time be in effect between the City and the operator of the City gas works, or, in the absence of a contract, in such manner as may be provided by ordinance.
351 Pa.Code § 3–909.

authorization of City Council, which ... will, in each fiscal year produce revenues, at a minimum:

(a) Sufficient to pay all of the operation and maintenance costs and expenses of conducting the Gas Works enterprise and to pay the interest and amortization becoming due in such fiscal year on debt incurred for the Gas Works, including, but not limited to:

(i) Charges for depreciation as prescribed in Section IV 1.(b);

(ii) Charges for employees' retirement costs as prescribed in Section IV 1.(c);

(iii) A management fee to Company [PFMC] equal to the actual cost to Company of managing the Gas Works but not to exceed $300,000 annually, effective as of January 1, 1979, and for all years thereafter. The Gas Works shall reimburse Company against vouchers on the first day of each calendar month for monies expended for the operation of the Gas Works in the previous calendar month;

(iv) Expenses of the Gas Commission; and

(v) All sinking fund charges payable in respect of principal and interest on all obligations of the City issued for or with respect to the Gas Works and, with respect to Gas Works Revenue Bonds issued pursuant to the First Class City Revenue Bond Act, such additional amount as may be required to comply with any rate covenant and sinking fund reserve requirement approved by ordinance of City Council in connection with the authorization or issuance of Gas Works Revenue Bonds.

(b) Sufficient also (together with the excess on a cumulative basis on internally generated funds available for the purposes set forth below in this subparagraph (b) of prior years beginning after June 30, 1974, to the extent that such excess shall not have been applied to such purposes and shall be available for payment of general expenses of such fiscal year and, subject and subordinate to the payment or provision for payment of all operation and maintenance costs and all sinking fund and sinking fund reserve requirements as set

forth in subparagraph (a) of this subsection 1., together with the excess funds provided by revenues of such fiscal year not required for such purposes):

(i) *To make base payments to the City in the aggregate annual principal amount of $18,000,000 payable in the amount of $4,500,000 on each February 1, March 1, April 1 and May 1,* provided the Gas Works may defer this payment to any time between said due date and June 30 of each year in which event it shall be assessed interest on the principal amount of prevailing rates, to be determined by the Director of Finance and the Gas Works, for the said due date of the date of payment or such different amounts at such different time, not greater in annual aggregate principal amount, as City Council shall prescribe;

(ii) To provide appropriations, to the extent not otherwise provided for prepayment of debt and for capital additions which have been determined by the Gas Commission to be reasonable and which have been determined by the Gas Commission to be reasonable and which have been approved by City Council; and

(iii) To provide cash, or equivalent, for working capital in such reasonable amounts as may be determined by the Company to be necessary and as shall be approved by the Gas Commission. (emphasis added)

On July 16, 1991, PGW filed a proposed $31,000,000 rate increase with the Gas Commission for the 1991–92 fiscal year. PGW subsequently amended this rate increase request to $28,000,000. Following formal public hearings, the Gas Commission adopted an order on December 19, 1991 permitting PGW to increase its rates by a total of $15,032,000 rather than the $28,000,000 PGW had requested.[3]

On January 21, 1992, the Public Advocate, which represents residential customers in gas rate proceedings, appealed the Gas Commission's decision to the Court of Common Pleas of

3. The Gas Commission entered an order and memorandum opinion on March 19, 1992 explaining this order.

Philadelphia County.[4] On January 31, 1992, PGW and PFMC filed notices of intervention. The City also filed a notice of intervention on February 6, 1992. The Court of Common Pleas, in affirming the majority of the Gas Commission's decision, concluded that PGW's required annual $18 million payment to the City did not violate the Pennsylvania Constitution or Pennsylvania law. In reaching this conclusion, the Court of Common Pleas noted that the $18,000,000 represented a reasonable return on the City's equity in PGW as well as reasonable consideration for the economic benefits that ratepayers received from the City's ownership of PGW, such as: PGW's ability to issue debt through the City on which interest is exempt from taxation, which provided an estimated value of $10,500,000 for the 1991–92 fiscal year; PGW's exemption from the state gross receipts tax on gas revenues, estimated benefit of $23,500,000 for fiscal year 1991–92; and, the fact that PGW is not subject to federal or state income tax, which provided an estimated benefit of $22,100,000 for the 1991–92 fiscal year.

On November 16, 1992, the Public Advocate appealed the Court of Common Pleas decision to the Commonwealth Court. The Public Advocate alleged that the annual $18,000,000 payment to the City: (1) violated just and reasonable rate protections; (2) constituted an unlawful taking of customer's property for public purposes; and, (3) was an illegal payment in lieu of taxes.

The Commonwealth Court (*en banc*, one judge concurring and dissenting) affirmed in part and reversed in part the decision of the Court of Common Pleas. The Commonwealth Court held that the annual $18,000,000 payment to the City should not be used in the rate calculation because it bore no rational relationship to PGW's performance and use. The Commonwealth Court reasoned that since the annual $18,000,-000 payment was not proportionate to the ratepayers' use of

4. Three community groups, Action Alliance of Senior Citizens, Consumer Education and Protective Association, and the Tenant Action Group joined in the Public Advocate's appeal from the Gas Commission's ruling.

PGW, the annual payment constituted a tax which was imposed without the City properly exercising its taxing powers, and thus, was arbitrary and unconstitutional. The Commonwealth Court also found that even though the City's balance sheet showed a net equity of $201,951,000 in PGW, that amount did not justify the annual $18,000,000 payment because the net equity figure cannot be said to have come directly from the City's own funding. The Commonwealth Court ultimately ordered that the matter be remanded to the Gas Commission to re-calculate PGW's rate increase request for the 1991–92 fiscal year without the required fixed annual $18,000,000 payment to the City.

The City, PGW and PFMC (collectively "Appellants") filed a petition for allowance of appeal which this Court granted.[5] This Court granted allocatur in order to determine whether the fixed annual $18,000,000 payment by PGW to the City, as required by the 1972 City ordinance, is constitutional and can be included in the calculation of PGW's rate increase for fiscal year 1991–92.

■ Where, as here, a complete record was developed before the local agency,[6] the court reviewing the matter on appeal must affirm the local agency unless it is determined that constitutional rights were violated, that an error of law was committed, that the procedure before the agency was contrary to statute or that necessary findings of fact were

5. After appellants filed their petition for allowance of appeal, the Public Advocate filed a motion with the Commonwealth Court to order that all payments made by PGW to the City since January 14, 1994 (the date of the Commonwealth Court's decision) pursuant to the 1972 ordinance be placed in escrow pending a final decision by this Court. The Public Advocate also sought an order requiring the Gas Commission to re-calculate all of PGW's rates for the period beginning from September 1, 1991 to the present without the annual $18,000,000 payment. An *en banc* Commonwealth Court denied the Public Advocate's motion since such a request exceeded the narrow scope of its order compelling the Gas Commission to re-calculate PGW's 1991–92 rates and its previous order did not prohibit the making of future payments. *See Public Advocate v. Philadelphia Gas Commission*, 166 Pa.Commw. 41, 646 A.2d 19 (1994).

6. It is undisputed that the Gas Commission is a local agency within the meaning of the Local Agency Law. 2 Pa.C.S. § 101.

unsupported by substantial evidence. *Insinger Machine Co. v. Philadelphia Tax Review Board,* 165 Pa.Commw. 344, 346 n. 4, 645 A.2d 365, 366 n. 4 (1994), *appeal denied* 540 Pa. 624, 657 A.2d 494, *cert. denied,* —— U.S. ——, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); 2 Pa.C.S. § 754(b).[7]

As previously discussed herein, the City owns PGW. By virtue of the First Class Home Rule Act, 53 P.S. § 13101, *et seq.,* the City:

> ... [S]hall have and may exercise all powers and authority of local self government and shall have complete powers of legislation and administration in relation to its municipal functions ... and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this and any other law.

53 P.S. § 13131. An ordinance which is properly adopted by the Philadelphia City Council has the force and effect of an act of the Pennsylvania assembly. *School Districts of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864, 871 (1965); *Action Alliance of Senior Citizens of Greater Philadelphia, Inc. v. Philadelphia Gas Commission,* 45 Pa. Commw. 234, 241, 406 A.2d 1155, 1158 (1979). As a legislative body, it is presumed that any laws enacted will be constitutional, even those laws effecting rates for gas service. *See Duquesne Light Company v. Barasch,* 488 U.S. 299, 316, 109 S.Ct. 609, 620, 102 L.Ed.2d 646 (1989) (United States Supreme Court has never doubted that legislative bodies are competent

7. Section 754(b) provides:
 In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any findings of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

bodies to set utility rates); *School Districts of Deer Lakes and Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658, 662 (1975) (one of the most fundamental statutory interpretation presumptions is that the legislature has acted constitutionally).

There is no dispute that the 1972 ordinance in question was properly enacted by City Council. The 1972 City ordinance sets forth a formula for setting rates which will produce sufficient revenue to pay PGW's operating and maintenance expenses. *See Action Alliance, supra* (approved "cash flow" method established by the 1972 City ordinance as the method by which PGW could establish rates). Thus, it is presumed that rates set in accordance with the 1972 City ordinance, which includes the fixed annual payment in dispute, are constitutional.

 PGW argues that it was error for the Commonwealth Court to strike down this annual payment as unconstitutional solely because it disagreed with the method employed to establish such a rate. As previously stated herein, PGW's rates are not subject to PUC regulation. *Action Alliance*, 45 Pa.Commw. at 241, 406 A.2d at 1158 (PGW "is not subject to PUC regulation"). Thus, strict reliance cannot be placed upon public utility statutes and PUC case law concerning rates. Even though the PUC cannot regulate the rates charged by a municipal utility like PGW, it does not mean that municipal utilities are not subject to any control. As this Court stated in *American Aniline Products, Inc. v. Lock Haven*, 288 Pa. 420, 135 A. 726 (1927):

> Courts have the power to determine questions relating to service and rates [of municipal utilities] where a complaint is based on 'reasonableness of the ordained rate or the justness of their application,' or discrimination amounting to confiscation.

288 Pa. at 424, 135 A. at 727.

 When examining the 1991–92 rates for PGW, this Court is mindful that no applicable constitutional requirement is more exacting than the requirement of "just and reasonable" rates. *Federal Power Commission v. Hope Natural*

*Gas Co.,* 320 U.S. 591, 607, 64 S.Ct. 281, 290, 88 L.Ed. 333 (1944). The United States Supreme Court has held that not every aspect of ratemaking has constitutional dimensions despite the fact that it might effect property rights. *Id.* 320 U.S. at 610, 64 S.Ct. at 291. Under the due process clause of the 5th and 14th Amendments to the United States Constitution, a utility "is entitled to rates, not per se excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services." *Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 475, 58 S.Ct. 990, 993, 82 L.Ed. 1469 (1938).

▇▇▇▇▇▇ When determining rates to charge to its users, utilities are not bound to use any single formula or combination of formulae. *Hope,* 320 U.S. at 610, 64 S.Ct. at 291. Different rate making formulas are allowed since the designation of a single theory of ratemaking as a constitutional requirement would have the effect of depriving consumers and investors from benefitting from alternative rate methods. The Constitution leaves the states free to decide what ratemaking methodology best balances the interest of the utility and the public. *Duquesne,* 488 U.S. at 316, 109 S.Ct. at 620.

▇▇▇▇▇▇ When determining if the rate set by the utility is constitutional, the United States Supreme court has stated that:

[I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*Hope,* 320 U.S. at 602, 64 S.Ct. at 288. *See also Duquesne,* 488 U.S. at 314, 109 S.Ct. at 619 (an otherwise reasonable rate if not subject to constitutional attack by questioning the theoretical consistency of the method that produced it since it is not the theory, but the impact of the rate order which counts). Any rate selected which falls within the broad zone of reasonableness cannot properly be attacked as unconstitutional for being confiscatory. *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 770, 88 S.Ct. 1344, 1361–62, 20 L.Ed.2d 312 (1968). This Court has followed the above guidelines set by the United States Supreme Court when examining utility rate disputes involving the PUC. *See Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 509 Pa. 324, 502 A.2d 130 (1985), *appeal dismissed* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986); *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985). We hold today that the United States Supreme Court guidelines for determining the constitutionality of a rate are also applicable to examining rate disputes involving municipal utilities.

In holding that the fixed annual $18,000,000 payment to the City as required by the 1972 City ordinance was unconstitutional, the Commonwealth Court appears to have focused on one element of the ratemaking formula rather than the overall impact of the Gas Commission's rate order. Past decisions of this Court and the United States Supreme Court have held that such a focus is improper. *See Hope, supra; Pennsylvania Electric, supra.*

A review of the overall impact of the Gas Commission's rate order for PGW's 1991–92 fiscal year mandates a different result. A review of the rate in question shows that the rate approved by the Gas Commission for PGW's 1991–92 fiscal year does not amount to a confiscatory rate. In fact, neither the Commonwealth Court nor the Public Advocate contends or has proven that the rate in question amounts to either a confiscatory or an unjust and unreasonable rate.

Moreover, the City owns PGW in its proprietary capacity. *Graham v. Philadelphia,* 334 Pa. 513, 518, 6 A.2d

78, 80 (1939) As such, PGW stands on the same footing as a private corporation and is entitled to the same privileges as a private corporation. *See In re Petition of City of Philadelphia,* 340 Pa. 17, 16 A.2d 32 (1940) (a municipality which owns and operates sewers is treated like a private corporation). As the owner, PGW would be entitled to whatever proceeds were generated from the sale of PGW were the utility to be sold. Also, the net equity balance sheet figure represents not only the corporate owner's capital contributions to the corporation but also includes any earnings retained by the corporation less any losses sustained by the corporation less any capital distribution back to the corporate owners. *See* 15 Pa.C.S. § 1551 (Distribution to Shareholders); *See also* Harold P. Starr, *Pa.Bus.Corp.Prac.* § 7.6 "Limitations on Distributions" (1991). Therefore, since the $201,951,000 net equity figure balance sheet figure represents the City's equity interest in PGW, the $18,000,000 payment to the City would represent a little less than a nine percent rate of return on equity. Such a rate of return is reasonable and rationally related to the City's asserted equity in PGW. *See Graham,* 334 Pa. at 522, 6 A.2d at 78 (city entitled to reasonable rate of return on its Gas Works assets).

Thus, the overall rate approved by the Gas Commission for PGW's 1991–92 fiscal year was constitutional since it was just and reasonable and since the fixed annual $18,000,000 payment is rationally related to the City's asserted equity in PGW. Therefore, the Commonwealth Court erred in remanding this case to the Gas Commission to re-calculate PGW's rate increase request for the 1991–92 fiscal year without the required fixed annual $18,000,000 payment to the City.

Finally, this Court notes that even though the rates set by the 1972 City ordinance are constitutional, consumers are not left without a remedy if they are dissatisfied with rates charged by PGW. As stated above, PGW's rates are set in accordance with a 1972 ordinance enacted by City Council. City Council is comprised of representatives elected by the residents of the City. If City residents desire a change in PGW's rate making method, they can either pressure City

Council to amend the 1972 ordinance or have their voices heard through the election process.

Accordingly, since the rates set by the Gas Commission's order for PGW's 1991–92 fiscal year are just and reasonable, it was proper for the Gas Commission to include the fixed annual $18,000,000 payment by PGW to the City, as required by the 1972 City ordinance, in the calculation of that rate. Therefore, the order of the Commonwealth Court is reversed.

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

ZAPPALA and CAPPY, JJ., concur in the result.