**NATIONAL UTILITIES, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 11, 1998.

Decided March 13, 1998.

Anthony C. Lomma, Scranton, for petitioner.

Kevin J. Moody, Harrisburg, for respondent.

Christine Maloni Hoover, Harrisburg, for intervenor, Irwin A. Popowsky, Consumer Advocate.

Before COLINS, President Judge, and DOYLE, SMITH, PELLEGRINI, KELLEY, FLAHERTY and LEADBETTER, JJ.

PELLEGRINI, Judge.

National Utilities, Inc. (NUI) appeals an order of the Pennsylvania Public Utility Commission (PUC) adopting the recommended decision of the Administrative Law Judge (ALJ) and denying its request to raise water rates to increase its annual operating revenues.

NUI is a public utility certified by the PUC that owns and operates 20 water utilities with 23 separate water systems. On November 30, 1995, NUI filed Supplement No. 1 to its Tariff Water—Pa. P.U.C. No. 24 to produce an increased annual operating revenue of $448,191. for an average increase of 49% by raising residential customer rates.[1] The Office of Consumer Advocate (OCA) filed a formal complaint against the proposed increase as did numerous customers[2] and the PUC suspended NUI's rate filing to investigate the fairness, reasonableness and justness of the proposed increase in rates. The ALJ consolidated the formal complaints with NUI's rate case and hearings were held for disposition of the matter.

NUI offered the testimony of Joseph D. Bontrager (Bontrager), President of NUI and its subsidiary utilities, to explain NUI's financial situation and the reason for its request to increase residential customer rates. Bontrager stated that in addition to NUI's normal operating expenses,[3] NUI had 15 different loans from the Pennsylvania Infrastructure Investment Authority (Pennvest), nine of which were not current in payments because there were insufficient operating revenues to meet its operating expenses. He stated that NUI had to repay Pennvest $293,168. per year for these loans, and the rate increase would help it to remain current with its payments and also meet its other expenses. The Office of Trial Staff (OTS) for the PUC also testified regarding NUI's financial status after receiving financial information from Management and Operation Audits concerning an audit it performed. OTS testified against a rate increase stating that NUI's annual revenues could be adjusted upward to correct an understatement of NUI's revenues for its Pocono and Moscow Water Systems and to reflect forecasted late payment penalty revenues. Similarly, downward adjustments could be made to decrease the amount of lost revenues. Regarding NUI's expenses, OTS testified that many of NUI's expenses were unnecessary and should be disallowed.[4]

Bontrager, also certified as a water works operator, testified regarding the current condition of the 23 water systems owned by NUI. He stated that when they were originally purchased, many of the systems had unpermitted water sources, used an open reservoir and surface water as a source of

1. The proposed rate increase would increase existing revenue requirements over NUI's three rate divisions. Rate division 1, which services Chinchilla, Moscow, Oak Hill and Scenic Knolls, would increase residential customers' rates from $357 to $496.32 per year or 39.03%. Rate division 2, which services Edgewood, Elmbrook, Factoryville, Glenburn, Hamilton, Heidelberg Heights, Mountainhome, Pocono and Rhodes Terrace, would increase residential customers' rate from $228.54 to $340.44 per year or 48.96%. Rate division 3, which services Hop Bottom, Midway Manor, Nuremberg, Rivercrest, Lazybrook, Sunset Hills and Warden Place, would increase residential customer's rates from $85.44. to $139.08 per year or 62.78%.

2. Sixty-eight formal customer complaints and 83 customer protest letters were filed in opposition to NUI's rate case. The Office of Small Business Advocate (OSBA) also filed a notice of intervention.

3. Bontrager stated these expenses included management and office payroll; employee benefits; cellular telephones; other telephones and pagers; telephone leasing costs; health and life insurance for office employees; corporate officer's salary; postage and meter expenses; uniform rentals; vehicle expenses, including gasoline and repairs; office and garage expenses, including rent; insurance; dues; subscriptions; seminars and filing fees; taxes and advertising.

4. For example, OTS recommended that NUI's expenses for depreciation of motor vehicles, advertising, unaccounted for water, and office equipment rental and supply be disallowed.

supply and were not maintained. However, after it purchased the systems and obtained permits from the Department of Environmental Protection, NUI eliminated the open reservoirs and surface water as a source of supply, developed deep wells as the new source of supplies and constructed enclosed water storage tanks. He further stated that necessary repairs and construction were made to the systems in the amount of $3.5 million over the last 11 years and all of them currently met the Primary and Secondary drinking water standards, as well as suitability standards for all household purposes.

Contrary to NUI's testimony that the water it provided met suitability standards for drinking as well as household usage, 133 customers from 17 of the 23 water systems owned and serviced by NUI testified before the ALJ over a four-day period about the poor quality of water and/or inadequate service provided to them. Almost all of the customers testified that their water was unsuitable for drinking, cleaning or bathing because it came out of the spout dirty, rusty and smelly. They also testified that they had low-water pressure or frequent, if not daily, water outages when the water turned off without warning or explanation and they did not know when it would be restored. Further, they did not receive notification when there was a problem with the quality of the water and it had to be boiled until days after the problem began.

Based upon the abundance of customer testimony regarding the water service provided by NUI, the ALJ found that NUI's rate increase request should be denied pursuant to Sections 526(a) and 1501 of the Public Utility Code (Code), 66 Pa.C.S. §§ 526 and 1501 [5] for poor quality and quantity of

water service. The ALJ provided the following explanation for her decision:

> Based on the credible and probative customer, OTS, and OCA evidence summarized below, I conclude, and recommend the Commission also conclude, that NUI provides inadequate quality and quantity of water service within the meaning of sections 526 and 1501 of the Public Utility Code, 66 Pa.C.S. §§ 526 and 1501, because there has been a significant failure on the part of NUI to provide water that is fit for all household purposes such as the basic, domestic purposes of drinking, washing, bathing and cooking. [citations of PUC decisions omitted].

> The credible and probative evidence provided by customer, OTS and OCA witnesses establishes that, persistently throughout NUI's three divisions and their component water systems, customers have frequent water outages which last from several hours to several weeks, water with excessive lead levels, frequent periods of very low water pressure, dirty-looking water (brown or rusty), water with the odor of rotten eggs, water with an unpleasant taste, water with sediment including metal particles or grit, water with high chlorine content which causes skin irritations, water which produces a filmy residue, insufficient notices of the commencement and lifting of boil water advisories, frequent boil water advisories some of which have lasted for months, and highly corrosive water which necessitates frequent replacement of household appliances such as hot water heaters.

> Moreover, the credible and probative evidence of customer, OTS, and OCA witnesses establishes that NUI regularly violates local municipal ordinances on street

---

**5.** Section 526(a) of the Code provides:

> The commission may reject, in whole or in part, a public utility's request to increase its rates where the commission concludes, after hearing, that the service rendered by the public utility is inadequate in that it fails to meet quantity or quality for the type of service provided.

Section 1501 of the Code provides in relevant part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable ser-

vice and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission.

excavations, fails to make proper repairs to public streets and customers' properties after fixing water main breaks, has failed to cap wells or properly close pipes to prevent contamination from debris, has not installed meters for all customers in water systems not exempted by the Commission from the universal metering requirement, and has never read meters installed in some locations. Furthermore, the credible and probative evidence provided by public input witnesses establishes that NUI provides slow and unsatisfactory responses to customer water service complaints including failing to report water test results to customers despite repeated requests for same and delaying several days or months before investigating or repairing water main leaks reported by customers. Finally, the credible and probative evidence provided by NUI customers establishes that NUI has failed to provide adequate service to its customers in the Scenic Knolls and Heidelberg Heights Water Systems by failing to pay its electric bills, thus putting itself at risk of loss of electric service and correspondingly placing its customers at risk of loss of water service.

(ALJ decision at pp. 73–75.)

Based on the financial evidence presented by the OTS, the ALJ also found that NUI had an overall rate of return of 7.08% despite NUI's evidence of a negative rate of return, but recommended that NUI not be permitted to earn *any* rate of return in this proceeding due to the inadequate service it provided. She also found that NUI had not provided current information in order to evaluate its revenue schedule and recommended that it be required to submit that information so that an accurate evaluation could be made of NUI's revenue relative to the level approved by the PUC in a previous rate case.

NUI filed exceptions to that recommendation in which it argued that the ALJ erred by lumping all customer service allegations together as if NUI was one water system because it was composed of 23 different water systems, each of which was unique. NUI further asserted that: 1) the customers did not have service outages that lasted for more than a few hours; 2) the water did not have excessive lead; 3) NUI timely investigated and repaired leaks; and 4) NUI did not have an excessive amount of boil water advisories for each system. Finally, NUI acknowledged that each water system had problems, but that it had responded to and corrected those problems.

■ Despite NUI's contentions, the PUC agreed with the ALJ that there was sufficient evidence to support a finding that there was a significant failure by NUI to provide adequate and reasonable service in all three rate divisions in violation of Section 1501 of the Code. The PUC noted that in addition to service problems, NUI had failed to pay its electric bills for two water systems, thereby putting itself at risk of loss of electric service and placing its customers at risk of loss of water service. The PUC then adopted the ALJ's recommendations and denied the rate increase requested by NUI pursuant to Section 526(a) of the Code. The PUC also determined that because it was denying NUI's rate increase request due to poor quality and service, it did not need to consider the issues regarding NUI's rate base, revenues, expenses or rate of return. This appeal by NUI followed.[6]

NUI contends that the PUC violated the Fifth and Fourteenth Amendments to the United States Constitution[7] when it denied its requested rate increase based on Sections 526(a) and 1501 of the Code because it was entitled to receive rates that were sufficient to yield a reasonable rate of return upon the

6. Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed or whether the necessary findings are supported by substantial evidence. *Shenango Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 686 A.2d 910 (Pa.Cmwlth.1996).

7. The Fifth Amendment to the U.S.Constitution provides in relevant part that no person shall be

deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use, without just compensation. Section one of the Fourteenth Amendment makes that applicable to the states providing in relevant part that no State shall deprive any person of life, liberty, or property without due process of law.

value of its property used to render services. Because the PUC denied its rate request, NUI contends the rate was confiscatory because it did not allow for a reasonable rate of return on the value of its property. NUI also argues that despite the PUC's power under the Code, neither the United States Constitution nor case law has carved out an exception to alleged service deficiencies.

■■■ A public utility has the constitutional and statutory right to a reasonable rate of return. *FPC v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Public Advocate v. Philadelphia Gas Commission*, 544 Pa. 129, 674 A.2d 1056 (1996). In Pennsylvania, Section 1301 of the Code, 66 Pa.C.S. § 1301,[8] requires that rates for a public utility must be just and reasonable. Whether a rate is reasonable is determined by the PUC and is based on whether the utility receives a fair rate of return. *Action Alliance of Senior Citizens of Greater Philadelphia, Inc. v. Philadelphia Gas Commission*, 45 Pa. Cmwlth. 234, 406 A.2d 1155 (1979). "Rates which are not sufficient to yield a reasonable rate on the value of the property used ... are ... confiscatory, and their enforcement deprives the public utility company of its property in violation of the 14th Amendment." *Keystone Water Company v. Pennsylvania Public Utility Commission*, 477 Pa. 594, 607, 385 A.2d 946, 953 (1978). The question here then is whether Section 526 of the Code giving the PUC the power not to increase rates when there is inadequate service would violate the constitutional requirement that a utility is entitled to a reasonable rate of return on its investment.

To support its contention that the PUC violated the Constitution by denying its request to increase its rates, NUI relies on the United States Supreme Court's decision in *Duquesne Light Company v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). In *Barasch*, Duquesne Light sought recoupment of expenditures invested in nu-

clear generating units that were never built due to a change in the outlook of demand for electricity and for nuclear energy. Pennsylvania law at that time required that rates for electricity be fixed without considering a utility's expenditures for electrical generating facilities that were never built. Duquesne Light requested a rate increase seeking to amortize its expenditures on the canceled plants over ten years. The increase was granted and the Office of the Consumer Advocate appealed to the Pennsylvania Supreme Court in light of Section 1315 of the Code, 66 Pa.C.S. § 1315,[9] an amendment to the Code that limited costs in the rate base and disallowed costs of construction of a facility that was not in use and useful to the public. Duquesne Light raised constitutional challenges arguing that the denial of recoupment for their investment was tantamount to a taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Our Supreme Court held "[t]he 'just compensation' safeguarded to a utility by the fourteenth amendment of the federal constitution is a reasonable return on the fair value of its property at the time it is being used for public service." *Barasch v. Pennsylvania Public Utility Commission*, 516 Pa. 142, 163, 532 A.2d 325, 335 (1987).

Duquesne Light appealed to the United States Supreme Court, again arguing that to exclude their investment costs from the rate base violated the Takings Clause of the Fifth Amendment, applicable to the States under the Fourteenth Amendment. The *Barasch* Court held that if rates did not afford sufficient compensation, the State had taken the use of the utility's property without just compensation in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution. However, it also stated that "the public is entitled to demand ... that no more be exacted from it for the use of [utility property] than the services rendered by it are reasonably worth." *Barasch*, 488 U.S. at

---

8. Section 1301 of the Code provides in relevant part:

    Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission.

9. Section 1315, commonly referred to as Act 335, was added to the Code by the Act of December 30, 1982, P.L. 1473, No. 335. That section provides limitations on consideration of certain costs in the rate base for electric public utilities.

308, 109 S.Ct. at 616. The Court concluded that the Constitution left to the states the freedom to decide what ratesetting methodology best met their needs to balance the interest of the utility and the public. Despite the fact that Pennsylvania's ratemaking scheme historically had been based on actual investment costs, the Court determined that the PUC did not "take" property just because it disallowed the recovery of Duquesne Light's capital investments under Act 335, because those investments were not used and useful in service to the public. The Court noted that the denial of Duquesne Light's amortized recovery of its investment would reduce its annual revenue allowance by only 0.5%, and its rates as modified by Act 335 did not fail to give a reasonable rate of return on equity.[10]

Although *Barasch* made it clear that rate increases requested by a public utility have to have some relationship to the service it provides to the public, it did not specifically address whether rate increases could be affected by substandard service provided to customers or whether a reasonable rate of return for the utility was required regardless of the service provided. Because this is the first time that Pennsylvania courts have been faced with these questions, we look to other jurisdictions for guidance in arriving at our decision.

In *D.C. Transit System, Inc. v. Washington Metropolitan Transit Commission*, 466 F.2d 394 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972), the United States Court of Appeals

for the District of Columbia spoke directly to these issues. In that case, the D.C. Transit System, Inc. filed tariffs requesting changes in its fares for transportation of passengers in the District of Columbia and its Maryland and Virginia suburbs. The fare increases were denied because the commission found that based on its financial instability due largely to poor management decisions, it had an inefficient transportation operation and a resulting deterioration in service that an increase in fares would not resolve—i.e., too few drivers, mechanics and bus cleaners.

On appeal, the Court was asked to determine whether a rate was confiscatory when adequate service was not being provided by the utility to its customers. Recognizing the interplay between the setting of reasonable rates and the quality of service provided to the utility's customers, the Court cited the commission's decision stating:

> [W]e hold that while we may grant a fare increase, and condition that increase on a carrier's satisfaction of the steps we have found necessary to insure future performance of its statutory obligation to provide economical, efficient and adequate transportation, we are not compelled to do so if we conclude, as we have in this case, that such an order will not provide sufficient assurance that the public will be protected ... We were forced to conclude that if fares were adjusted before the company produced the required funds, we would have no basis for insuring that they, in fact, would be forthcoming. This, we held,

---

**10.** The Pennsylvania Supreme Court's most recent pronouncement regarding the constitutionality of utility rates was made in *Public Advocate v. Philadelphia Gas Commission*, 544 Pa. 129, 674 A.2d 1056 (1996). In that case, the issue was whether a fixed payment by the Philadelphia Gas Works (PGW) to the City of Philadelphia was constitutional and could be included in the PGW's rate increase. While not addressing the issue of rates and their relationship to adequacy of service, our Supreme Court adopted the rationale in *Barasch* that any rate falling within the broad zone of reasonableness could not be attacked as unconstitutional for being confiscatory. Concluding that the payment was not unconstitutional, our Supreme Court stated:

> When examining the 1991–92 rates for PGW, this Court is mindful that no applicable constitutional requirement is more exacting than the

requirement of "just and reasonable" rates. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 607, 64 S.Ct. 281, 290, 88 L.Ed. 333 (1944). The United States Supreme Court has held that not every aspect of ratemaking has constitutional dimensions despite the fact that it might effect property rights. *Id.* 320 U.S. at 610, 64 S.Ct. at 291. Under the due process clause of the 5th and 14th Amendments to the United States Constitution, a utility is "entitled to rates, not per se excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services." *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 993, 82 L.Ed. 1469 (1938).

*Id.* at 139–140, 674 A.2d at 1061.

would be calling upon the bus rider to pay a fare to an inefficiently and uneconomically operated transit company without any assurance that the company would remedy those defects and fulfill its obligation to the rider by providing, in the future, efficient, economical, and adequate transportation. We declined to impose such a one-sided and unjust burden on the bus-riding public.

*Id.* at 417.

The Court continued to state that the caliber of a utility's service was not a neutral factor in determining its allowable rate of return. "The cases have consistently said that superior service commands a higher rate of return as a reward for management efficiency; more importantly for present purposes, they have also maintained that inefficiency and inferior service deserve less return than normally would be forthcoming." *Id.* at 419. Although the utility in *D.C. Transit System* argued that its revenues could not fall below a fair rate of return no matter what the circumstances, and to allow that would be a violation of due process, the Court concluded that due process was not violated when the commission considered practical results to the public. The Court noted that the "utility's fulfillment of its service commitments is a *sine quo non* to constitutional protection under confiscation principles." *Id.* at 419.[11]

That viewpoint was followed more recently in *Petition of Valley Road Sewerage Company*, 285 N.J.Super. 202, 666 A.2d 992 (1995). In that case, Valley Road Sewerage Company (Valley) applied to the Board of Public Utilities (Board) for a rate increase. Valley had nearly a half a million dollars in liability for failing to pay taxes and had a chronic record of environmental violations for which it owed over $500,000. The request was denied due to the company's years of financial mismanagement and because it had received substantial increases twice before with only further deterioration in the company's financial condition. On appeal, the issue was whether the Board violated Valley's constitu-

tional and statutory rights by denying rate relief.

Initially, the Court of Appeals noted that a rate confining a utility's rate of return to an amount below the point of confiscation violated due process. "The term 'reasonable' is hardly more precise than its antonym, 'confiscatory.' Although no single formulation has achieved universal acceptance, we have said that to pass constitutional muster the rate must be sufficient to provide for the company's financial security, attract necessary capital, and yield a reasonable return on investment." *Id.* at 208, 666 A.2d at 995. However, the Court also stated that what was considered reasonable involved an evaluation of not only the utility's interest, but also the interests of the consumer and the general public. "The point we stress here is that rate levels are not offensive to constitutional and statutory standards merely because they fix returns at a lower scale for inefficient operators." *Id.* Although Valley had never reported a profit, the New Jersey Supreme Court stated:

Price and performance are inextricably intertwined. "The caliber of a utility's service need not remain a neutral factor" in deciding what is a reasonable rate of return. [citation omitted]. Neither the constitution nor our statutes require the public "to pay for the consequences of lazy or inefficient management." [citation omitted]. Superior service commands a higher rate of return as a reward for managerial efficiency, but inferior service deserves less return than normally would be forthcoming. [citation omitted]. The public is entitled to demand that no more money be extracted from it than the services rendered by the utility are reasonably worth. [citation omitted] ... We believe that the obligations of the utility and the consumer are interrelated and reciprocal. The utility's responsibility is to "furnish safe, adequate and proper service." The consumer is obliged to pay this service's reasonable worth. But good company management is required; honest stewardship is demand-

---

**11.** *See also Market Street Railway Company v. Railroad Commission of California,* 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945) (due process clause of the Constitution is not violated when a commission takes into consideration practical results to the public of advances which it has allowed in rates).

ed; [and] diligence is expected. [citation omitted]. ·

*Id.* In denying the requested rate increase, the Court went on to state:

> We also acknowledge that "[a] starved utility is in no better position to render proper service than a starved horse or a motor car without fuel." [citation omitted]. Nevertheless, if Valley is correct, then it may disregard its public responsibilities at will, yet insist the public pay ever-increasing rates for substandard service. Neither the constitution, nor our statute, nor common sense require such a result.

*Id.* at 211, 666 A.2d at 996.

*See also In re Petition of Young's Community TV Corporation for a Rate Increase*, 141 Vt. 53, 442 A.2d 1311 (1982) (poor service does not support an increased rate of return); *State ex rel. Utilities Com'n v. General Telephone Company of Southeast*, 285 N.C. 671, 208 S.E.2d 681 (1974) (utilities commission did not err in considering service inadequacies when determining rate of return).[12]

While we recognize that to starve NUI of a rate increase may hinder its abilities to upgrade its systems, we also recognize that a public utility is not entitled to a rate increase when its service is so inadequate. As the D.C. Court of Appeals observed, a utility's fulfillment of its service commitment is a *sine quo non* to constitutional protection under confiscation principles. To hold otherwise would mean that regardless of the level of service provided by a utility, or if the utility provided no service, the PUC would be required to give the utility a reasonable rate of return solely because it exists. In this case, there was ample evidence of an inadequate level of service that did not justify any increase in rates.

Adopting the sound reasoning of *D.C. Transit* and *Valley Road Sewerage Company*, we hold that the Fifth and Fourteenth Amendments to the U.S. Constitution are not violated when a public utility is denied an increase in rates when it fails to provide adequate service to the public, even if the result is a rate of return less than it would otherwise be entitled to receive. Because the evidence supports the PUC's finding that NUI provided inadequate service to its customer, its determination to refuse NUI's request to increase its rates which consequently may result in a reduced rate of return is not in violation of the United States Constitution.[13]

NUI also argues that the PUC erred in denying its request to increase its rates because most of the water systems have no

---

12. Other jurisdictions also consider inadequate service when determining whether a utility is entitled to a rate increase, but hold that despite inadequate service, the utility is entitled to a rate of return within a "reasonable" range as determined by the appropriate commission. *See U.S. West Communications, Inc. v. Washington Utilities and Transportation Commission*, 134 Wash.2d 48, 949 P.2d 1321 (1997); *Mountain Fuel Supply Company v. Public Service Commission of Utah*, 861 P.2d 414 (Utah 1993); *Gulf Power Company v. Wilson*, 597 So.2d 270 (Fla. 1992). What constitutes "reasonable" is whether there is enough revenue to allow the company to remain in business. In any event, we do not need to address those cases because none of them involved a provision similar to Section 526 of the Code allowing their respective commissions to reject a utility's rate request in whole when inadequate service was rendered, and no claim is being made by NUI that denial of an increase will cause it to go out of business We note that while the PUC did not adopt the ALJ's finding regarding NUI's rate of return, the ALJ found that NUI's rate of return without granting a rate increase was 7.08%.

13. NUI argues in the alternative that public interest dictates that the PUC should have at least approved rates sufficient to repay its loans to Pennvest. NUI explains that if it does not have sufficient revenues to repay Pennvest and meet its operating expenses, it will cease to exist. However, based on the evidence of record, the ALJ found and recommended to the PUC that NUI had sufficient funds available to repay its Pennvest loans, but rather than paying those loans, it placed a priority on paying its expenses instead, some of which were excessive and unnecessary. The ALJ also noted that the PUC had previously allowed NUI to roll surcharges for its Pennvest loans into base rates to customers. Because the PUC adopted the ALJ's recommendations based on the evidence of record and the PUC is the ultimate factfinder, we will not disturb the PUC's determination that NUI has sufficient revenues to repay its loans to Pennvest. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 164 Pa.Cmwlth. 88, 642 A.2d 541 (1994).

service problems or only limited service problems, and the PUC grouped all 23 separate water systems into one system. Because there were systems without any problems or minimal problems, NUI argues that the PUC should have granted the rate increase for those systems. While NUI makes this assertion despite a mountain of evidence indicating that its service to almost all the individual` systems was deficient, the ALJ denied NUI's request to increase its rates based on the three divisions for which rates were set. Because rate increases are not granted based on individual systems but on divisions, NUI's argument is meritless.

Accordingly, the decision of the PUC is affirmed.

### ORDER

AND NOW, this 13th of March, 1998, of the Pennsylvania Public Utility Commission dated January 16, 1997, is affirmed.