McDONALD'S CORPORATION

v.

BOARD OF LICENSE & INSPECTION REVIEW OF the CITY OF PHILADELPHIA

Appeal of City of Philadelphia.

McDonald's Corporation and City of Philadelphia

v.

Rev. Larry H. Falcon

Appeal of McDonald's Corporation.

Commonwealth Court of Pennsylvania.

Argued March 3, 2004.
Decided May 18, 2004.

Eleanor N. Ewing, Philadelphia, for appellant, City of Philadelphia.

John J. McAleese, III, Philadelphia, for appellee, McDonald's Corp.

Michael I. McDermott, Philadelphia, for appellee, Rev. L. Falcon.

BEFORE: McGINLEY, Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

McDonald's Corporation (McDonald's) and the City of Philadelphia (City) (Collectively, Appellants) appeal from the order of the Court of Common Pleas of Philadelphia County (trial court) which affirmed the decision of the Philadelphia Board of License and Inspection Review (Board) that sustained the appeal of Reverend Larry H. Falcon (Rev.Falcon) who objected to a permit issued by the City's Department of Health, Air Management Services (AMS) to McDonald's in connection with the remediation of contaminated property. We reverse the trial court.

In September of 2000, McDonald's purchased property located at 4240–52 Market Street in Philadelphia (Property). McDonald's removed existing buildings from the lot in order to construct its restaurant. McDonald's was aware prior to purchase of an underground gasoline storage tank (storage tank) located in the southeast corner of the Property. McDonald's contracted with Whitestone Associates, Inc. (Whitestone) to provide environmental consulting services for the removal of the storage tank. The storage tank was successfully removed in accordance with the requirements of the Pennsylvania Department of Environmental Protection (DEP).

In the course of further removal of buildings on the Property, McDonald's discovered another storage tank that was previously unknown to McDonald's. McDonald's again retained Whitestone to remove the storage tank. Upon removal, Whitestone discovered an empty tank and through soil sampling and analysis, discovered that the soil around and beneath the tank was heavily contaminated with tetrachloroethylene (PCE).

McDonald's directed Whitestone to remove the PCE-contaminated soil and properly dispose of it off-site. Over the course of two weeks at the end of February and beginning of March, 2001, Whitestone excavated approximately 450 tons of contaminated soil which was taken to Clean Earth of Philadelphia, Inc., where it was properly treated.

Despite these efforts, PCE contamination remained in the soil. Due to the limited size of the property, Whitestone was unable to remove additional soil from the excavation. Therefore, McDonald's directed Whitestone to backfill the excavation with non-contaminated soil purchased off-site, determine the vertical and horizontal extent of PCE contamination remaining on-site and develop a plan for remediation of the remaining contamination.

Whitestone determined that approximately 4,500 to 5,000 cubic yards of PCE contaminated soil continued to exist below the surface of the Property. In response, Whitestone evaluated three alternative remediations: 1) excavation for off-site treatment by thermal desorbtion, 2) in situ bioremediation, or 3) in situ soil vapor extraction.[1]

Whitestone determined that in situ soil vapor extraction (SVE) would be best suited for this site. The SVE system consists of slotted plastic pipes that are buried in the ground in the areas of contamination. The pipes are then connected to a vacuum pump located above the ground surface which pulls the air out of the contaminated soil. The PCE contained in the soil volatizes into the air being pulled out of the ground. The PCE-containing air exhausted by the vacuum pump is then directly passed through two carbon filters placed in series, where 99.9% of the PCE is removed from the air stream. The clean air is then exhausted from the carbon filters. Once the carbon canister becomes filled with PCE, it is removed from the system and sent off-site to a treatment facility where the PCE is removed for recycling or incineration. A second canister is then placed where the first canister was located.

Whitestone determined that this technique was well suited for the Property as: 1) it will effectively and efficiently remove the PCE from the soil without excavation; 2) no appreciable amounts of PCE will be released to the environment during the remediation; 3) the restaurant can be constructed and operated safely during the remediation of the sub-surface soil contamination; 4) the remediation will not affect the residential neighbors of the Property; and 5) SVE is a commonly used remedial technology that has been successfully implemented throughout the United States as well as in the City of Philadelphia.

McDonald's preliminarily selected the SVE system as the means to remediate the PCE contaminated Property. McDonald's authorized Panther Technologies (Panther) to construct and operate a pilot SVE system at the Property. After applying for and obtaining a permit exemption from AMS for the construction and operation of the pilot system, Panther built a pilot system at the Property during the week of August 15, 2001. Panther operated and evaluated the pilot system for two days during that same week. Panther evaluated the ability of the pilot system to effectively remove PCE from the sub-surface soils and the ability of the carbon filters to effectively remove PCE from the sub-surface air stream. After the conclusion of the pilot system study, Panther determined that the pilot SVE system effectively removed PCE from the sub-surface soils and that the carbon filters were able to remove 99.9% of all PCE from the air stream. In addition to validating the SVE system's capability to safely and effectively remove the PCE from the sub-surface soils, Panther was also able to glean important information for the designing of the full-scale SVE system.

In October of 2001, Whitestone, on behalf of McDonald's, submitted its Remedial Investigation Report and Clean–Up Plan to the DEP. This report outlined the investigation of the contamination, the planned remediation, and the results of the SVE pilot system study. On January 3, 2002, the DEP provided its approval of the SVE system for remediation of the PCE contaminated Property.

In January of 2002, McDonald's applied to AMS for a permit needed to implement

1. Thermal desorbtion is a process whereby the PCE is removed from the soil by heating the soil to accelerate the volatization of the PCE. The PCE is then removed from the air stream.

the SVE system. AMS issued a permit to McDonald's for the SVE system on April 18, 2002.

On May 1, 2002, Rev. Falcon filed an appeal to the Board objecting to the issuance of a permit by AMS to McDonald's. Rev. Falcon contended that he and other residents in the neighborhood had suffered and reported health problems after the pilot test had been conducted which had not been addressed by the AMS. On May 28, 2002, the Board held a hearing on Rev. Falcon's appeal, which it sustained, invalidating the permit. Petitions for reconsideration were denied by the Board. On July 24, 2002, the Board issued Findings of Fact and Conclusions of Law which stated in pertinent part as follows:

> 9. The review by the Department of Health (Air Management Services) of an application for permit must consider compliance with the regulations of the Air Pollution Control Board, operating and maintenance problems at similar installation, other factors related to performance, maintenance and dependability, results of pilot tests, and anticipated effects on air quality in the neighborhood. Air Management Code, section 3–301. Contrary to the assertions of the Department of Health and McDonald's, the permit issued by the Department of Health was not validly issued because the anticipated effect on the air quality in the neighborhood were not assessed. In fact, the effect on air quality was completely ignored. Several complaints were made by residents and neighbors about becoming ill and the Department gave cursory review to their complaints and made no effort to thoroughly investigate them notwithstanding the fact that the reported ills occurred at or around the time of the pilot test. The Department dismissed the complaints and ignored their relevancy for lack of substantiation by a medical professional. Instead of considering in its review all factors required by the Air Management Act, the Department limited its analysis to technical compliance with mathematical emission levels. In fact, when asked about the safety of those levels, the witness presented by the City would not agree that they were safe, but only that they were more stringent than federal levels. The purposes and intent of the Air Management Code are not served or met when a permit is issued without adequately considering the impact on the air quality and the extent to which air pollution and an air pollution nuisance may be instigated by the proposed emission.

Board Findings of Fact and Conclusions of Law, at 5. McDonald's and the City timely appealed to the trial court.

On April 30, 2003, the trial court affirmed the Board stating in pertinent part as follows:

> The Board found that residents in the neighborhood had suffered health problems after the pilot test for extraction of the pollutant had been conducted. It concluded that Air Management Services was aware of the health complaints when it issued the permit in question. It found the permit should not have been issued without a thorough investigation, as it violated the Air Management Code's purpose of insuring air quality and prevention of pollution that proves to be injurious to humans or interferes with the "comfortable enjoyment of life or the conduct of human activities." Air Management Code, § 3–102.
>
> . . .
>
> A review of the record establishes that several neighbors testified they had become ill after the pilot test was conducted. The Board clearly found their testimony credible. The Health Department's sole response was to advise the residents to see their health care provider. The Board felt a more thor-

ough investigation was warranted in light of the numerous complaints of health problems, and that a permit should not have been issued until that investigation proved the problems were unrelated to the process. This Court is not empowered to substitute its judgment for that of the Board when the decision is based on substantial evidence.

Trial Court Opinion, October 6, 2003 at 3–4. On July 10, 2003, after a previous grant of reconsideration, the trial court denied Appellant's motion for reconsideration, thereby confirming the April 30, 2003 trial court order. Appellants appealed to our Court.[2]

Appellants contend that the trial court erred in affirming the decision of the Board where the Board's necessary findings are not supported by substantial evidence of record.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Philadelphia Civil Service Commission,* 518 Pa. 170, 175, 542 A.2d 519, 522 (1988). Substantial evidence is "more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." *Id.* at 522. Where findings necessary to support an agency determination are not supported by substantial evidence, we must reverse that determination.

The Philadelphia Air Management Code (Air Code) states in pertinent part as follows:

(9) The Department shall review all applications for permits and licenses required by this Title and the regulations

adopted hereunder and recommend approval, modification or disapproval. **Factors to be considered shall include** compliance of the proposed installation with the regulations of the Air Pollution Control Board, operating and maintenance problems experienced at similar installations, **anticipated effect on air quality in the neighborhood, area, and region,** results of experimental tests and pilot plants, and other factors related to performance, maintenance, and dependability. Such approval may be revoked on order of the Department of Public Health for violation of the provisions of the permit approval, this Title, or the regulations. (emphasis added).

Air Code § 3–301(9). The trial court found that the Air Code requires that the "anticipated effect on air quality in the neighborhood" be taken into consideration when reviewing an application for a permit and that in the present controversy, it was not. We disagree.

The only testimony that relates to the trial court's findings which was offered by the residents of the neighborhood where the Property is located who testified on their own behalf to reporting health problems to the City after the pilot test was conducted.

Tom Huynh, Administrative Engineer Manager for AMS (Huynh), testified on behalf of Appellants. Huynh's testimony revealed that a computer model determined the worst case scenario of PCE emissions resulting from the proposed SVE system and that they were less than the City's emissions standard, a standard established to protect public health and safety.[3] Huynh further testified that the

**2.** Our review is limited to whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are not supported by substantial evidence. *Public Advocate v. Philadelphia*

*Gas Commission,* 544 Pa. 129, 674 A.2d 1056 (1996).

**3.** The emissions standard is established to protect public health and safety and is an

results of the pilot study showed no PCE emissions and that the SVE system was a safe way to extract the soil. Huynh's testimony supports a determination that the permit application included consideration of the SVE system's anticipated effect on air quality and the health of the residents.

A review of the record reveals that the pilot study showed no PCE emissions, that the residents provided no medical testimony to support their claims, nor any scientific evidence to link their alleged health problems to the study. The City did conduct more research regarding the permit application due to the resident's health complaints and did direct them to seek medical advice; however, they chose not to seek medical attention. Although the testimony that the residents became ill was found credible by the Board, there was no evidence whatsoever that any of the various illnesses reported were caused by the PCE's from the site. AMS' failure to further investigate by providing medical examinations, etc. for the neighborhood was a reasonable response to the health complaints of a vague, general nature which occurred at or around the time of the pilot test.

The burden of AMS was to consider the "anticipated effect on air quality in the neighborhood area", not to rule out complaints without a medical causal connection to the PCE's. Complaints of illness not causally connected are not substantial evidence which will support the trial court's conclusion that AMS violated the Air Code's purpose of ensuring air quality that prevents injuries to humans and the interference with their comfortable enjoyment of life.

On the contrary, the record reveals that AMS complied with the Air Code and that it considered all appropriate factors, including the anticipated effects that the

SVE system would have on the air quality of the neighborhood, prior to issuing the permit to McDonald's. The trial court opinion is not supported by substantial evidence. Accordingly, we must reverse the decision of the trial court.

### *ORDER*

AND NOW, this 18th day of May, 2004 the order of the Court of Common Pleas of Philadelphia County in the above captioned matter is reversed.

implicit assessment of the anticipated impact on air quality and human health.